# EXHIBIT 6

AVANGARDCHIK vs RAJA MANAGEMENT
ERIN FUCHS

06/29/2020

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION
CIVIL ACTION NO. 2:19-CV-70-FTM-99MRM

GARY WALTERS,
        Plaintiff,
vs
FAST AC, LLC and FTL CAPITAL
PARTNERS, LLC d/b/a FTL
CAPITAL FINANCE,
        Defendants.
_____/

- - -
ZOOM VIDEO DEPOSITION OF ERIN FUCHS
TAKEN AT THE INSTANCE OF THE PLAINTIFF
- - -

Zoom Video
Wednesday, June 17, 2020
10:00 a.m. - 12:06 p.m.

Stenographically Reported by
Mary Ann Hengstler, RPR
Notary Public, State of Florida

---

**Page 2**

1  APPEARANCES:
2  CONSUMER LAW ORGANIZATION, P.A.
   721 U.S. Highway One, Suite 201
3  North Palm Beach, Florida 33408
   Counsel for the Plaintiff
4  561.822.3446
   darren@cloorg.com
5  BY:  DARREN R. NEWHART, ESQUIRE
6  LATHROP GPM, LLP
   7701 Forsyth Bouevard, Suite 500
7  Clayton, Missouri 63105
   Counsel for the Defendant
8  314.613.2818
   BY:  PATRICIA SILVA, ESQUIRE
9
10  ALSO PRESENT:  Todd Grzybinski
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1              INDEX
2  WITNESS                    PAGE
3  ERIN FUCHS
4    Direct Examination by Mr. Newhart     4
5
6
7
8        EXHIBITS FOR IDENTIFICATION          PAGE
9
   Plaintiff's Exhibit No. 25          19
10  (Customer complaint process)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1        The Zoom Video deposition of ERIN FUCHS was
2  taken before me, MARY ANN HENGSTLER, Registered
3  Professional Reporter, RPR-CP, Notary Public, State of
4  Florida at Large, beginning at the hour of 10:00 a.m.,
5  on Wednesday, June 17, 2020, pursuant to Notice filed
6  herein, at the instance of the Plaintiff in the
7  above-entitled cause pending before the above-named
8  Court.
9            - - -
10  THEREUPON,
11          ERIN FUCHS,
12  being by me first duly sworn to testify the whole
13  truth, as hereinunder certified, testified as follows:
14        DIRECT EXAMINATION
15  BY MR. NEWHART:
16    Q.  Morning, Ms. Fuchs.  My name is Darren
17  Newhart.  I represent the plaintiff in this case.  Is
18  anybody else going to be in the room with you during
19  the deposition?
20    A.  Yes.  Todd Grzybinski is with me.
21    Q.  Okay.  I'd just ask that there be no
22  communication between yourself and Todd during the
23  deposition at all.  Okay?
24    A.  Okay.
25    Q.  I'm going to go over some ground rules.

---

1  (Pages 1 to 4)

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)

3e45e38a-3358-4c0d-9e79-86ecb951376e

AVANGARDCHIK vs RAJA MANAGEMENT                     06/29/2020
ERIN FUCHS

Page 5

1    Please give audible responses so the court reporter can
2    take down your answers.  And let's also try not to talk
3    over each other.  It makes it very difficult for the
4    court reporter also to take down your answers.
5        If at any time, if you need to take a break,
6    just let me know.  The only thing I ask is if there's a
7    question pending, please just answer the question.  If
8    you don't understand the question, ask me to repeat it
9    or rephrase it, but if you answer it I'm going to
10   assume that you understood the question and move on.
11   Okay?
12       A.  Okay.
13       Q.  Can you please state your name for the
14   record?
15       A.  Erin Fuchs.
16       Q.  And you're employed by FTL, correct?
17       A.  Correct.
18       Q.  And what's your job title at FTL?
19       A.  Operations Manager.
20       Q.  And have you always been the operations
21   manager at FTL?
22       A.  No.
23       Q.  What was your previous position before
24   operations manager?
25       A.  I was the customer service manager.

Page 6

1        Q.  Okay.  And how long have you been the
2    operations manager?
3        A.  Since 2017.
4        Q.  I'm sorry.  You broke up at the end.
5        A.  Since 2017.
6        Q.  Okay.  How long were you the customer service
7    manager?
8        A.  From 2014 to 2017.  Two and a half years.
9        Q.  Were you employed by FTL prior to 2014?
10       A.  No.
11       Q.  Okay.  Who was your employer prior to 2014?
12       A.  Fleet Feet Sports.
13           THE REPORTER:  Could you repeat that?
14           THE WITNESS:  Fleet Feet Sports.
15   BY MR. NEWHART:
16       Q.  What kind of job did you have at Fleet Feet
17   Sports?
18       A.  I was a store manager and salesperson.
19       Q.  As an operations manager, what type of job
20   responsibilities do you have?
21       A.  I'm responsible for supporting department
22   leaders.  There are seven departments that report to
23   me.  So I help them design processes and kind of coach
24   their employees so that their departments run
25   efficiently.

Page 7

1        Q.  So you said supporting department leaders,
2    you help design processes, and also coach employees?
3        A.  Mm-hmm.
4        Q.  Are there any other types of job
5    responsibilities that you have as an operations
6    manager?
7        A.  I -- I work with our technical systems to
8    make sure that the systems are set up to give the
9    employees the information they need to do their job.
10   And I also work to kind of orchestrate collaboration
11   between departments.  So I do a lot of, like,
12   connecting departments together to make processes run
13   smoothly.  I think that's all.
14       Q.  Do you know if FTL has a vice president?
15       A.  We have a vice president of sales and
16   marketing.
17       Q.  You previously said that you help design
18   processes.  Can you describe -- elaborate that --
19   excuse me -- elaborate on that a little bit more for
20   me?
21       A.  Sure.  So I work with department leaders to
22   identify inefficiencies in their processes and make
23   suggestions to -- how to create some structure.  You
24   know, I help them really define who does what, when
25   within their department.

Page 8

1        Q.  And what types of departments does FTL have?
2    I believe you said there were seven, correct?
3        A.  Yeah.  Seven that report to me.  So customer
4    service, collections, our account manager team, inside
5    sales, underwriting, technical support and accounting.
6        Q.  So you oversee all seven of those departments
7    that you just described?
8        A.  I do.
9        Q.  Okay.  Can you elaborate a little bit more on
10   how you help coach employees?
11       A.  Yes.
12       Q.  And if you want we can narrow that down to
13   collection employees.
14       A.  Okay.  So my involvement in coaching the
15   collection employees is giving feedback to help them
16   provide excellent service.  So if they're -- you know,
17   kind of call monitoring at times to -- to ensure that
18   they're providing excellent service to our customers.
19   I'll provide coaching to make sure that they understand
20   our leasing software.  So they know how to find the
21   information they need to deliver that to our customers.
22   Yeah.  Kind of just making sure that they -- coach them
23   to do their job as best they can.
24       Q.  Do you help coach employees on FTL's policies
25   and procedures?

2  (Pages 5 to 8)

FLORIDA COURT REPORTING
561-689-0999

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)                              3e45e38a-3358-4c0d-9e79-86ecb951376e

AVANGARDCHIK vs RAJA MANAGEMENT                        06/29/2020
ERIN FUCHS

---

Page 9

1        A.   Yes.  Typically I kind of help the department
2   leader design and create the processes, and then
3   department leaders are actually doing the coaching.  I
4   just support the department leader in their coaching.
5        Q.   Okay.  Can you elaborate a little bit more on
6   how you help coach employees in the customer service
7   department?
8        A.   I'd say the same way.  So the department
9   leader is the person who consistently connects with and
10  holds accountable the customer service representatives.
11  But I just support the department leader in the event
12  that they have questions or need a perspective or
13  troubleshooting.
14       Q.   And were your job responsibilities that
15  you're describing the same in 2018?
16       A.   They've evolved.  But the basic
17  responsibilities were the same.  I was operations
18  manager at that time.  So I've become involved in more
19  things since, but, yes.
20       Q.   Can you describe what you've become more
21  involved in?
22       A.   Sure.  So I have become more involved in
23  making sure our operational expenses are in line with
24  the initiatives and strategies that we have.  So I've
25  just been, you know, sort of managing budget but I

---

Page 10

1   didn't as much in 2018.
2        Q.   Okay.  Have they changed in any other way?
3        A.   Not that I can think of.
4        Q.   Have you ever been deposed before?
5        A.   No.
6        Q.   This is your first experience?
7        A.   Yep.
8        Q.   Did you do anything to prepare for today's
9   deposition?
10       A.   I met with Patty on Friday.
11       Q.   Other than speaking with your attorney, did
12  you review -- or excuse me -- did you speak with
13  anybody else?
14       A.   No.
15       Q.   Did you look at any documents to help
16  prepare?
17       A.   No.  I -- I provided documents way back when.
18  But I didn't -- Patty said I didn't need to do any
19  research.
20       Q.   What documents did you provide?  And I'm
21  assuming you're speaking about helping Todd prepare for
22  the corporate representative deposition?
23       A.   Correct.  Right.
24       Q.   What documents did you help gather?
25            MS. SILVA:  And, you know, to the extent that

---

Page 11

1   anything was at the direction of counsel, you know,
2   don't -- don't go into that.  If there's anything
3   aside from that you can speak to.
4            THE WITNESS:  Sure.  So I believe there were
5       a whole bunch of response documents and recorded
6       calls that were provided.
7   BY MR. NEWHART:
8        Q.   And what response docs are you talking about?
9        A.   So, like, the customer's contract, the
10  certificate showing that he passed LexisNexis ID check.
11  Gosh, what else... I think a copy of the application
12  that Mr. Walter's submitted in the credit report.
13  FTL's -- some of FTL's processes.  Like our customer
14  complaint process.  I think that's all.  I don't
15  remember exactly.
16       Q.   In 2018 FTL used a software called Sales
17  Force; is that right?
18       A.   Right.
19       Q.   Do you know if Sales Force has the ability to
20  search for customer complaints?
21       A.   No.
22       Q.   Does it have the ability to keyword search?
23       A.   Yes.
24       Q.   So you're able to identify -- or excuse me.
25  Let me strike that.

---

Page 12

1            You're able to search specific keywords and
2   that would pop up throughout customers' files within
3   Sales Force?
4        A.   Mm-hmm.  Yes.
5        Q.   I believe you were speaking about you help
6   coach employees on FTL's policies and procedures.  Is
7   the document called the Employee Compliance Training
8   Program?
9        A.   Mm-hmm.  Yes.
10       Q.   And those are FTL's policies and procedures?
11       A.   Yes.
12       Q.   And those were in place in 2018, right?
13       A.   Yes.
14       Q.   Did you help create those policies and
15  procedures?
16       A.   Yes.
17       Q.   Do you know when they were created?
18       A.   I don't.
19       Q.   Is there anything that would represent
20  refresh your recollection of when they were created?
21       A.   I can go on my computer.
22       Q.   And e-mail or -- I'm sorry, go ahead.  I
23  didn't mean to interrupt you.
24       A.   It's okay.  I could look on my computer.
25       Q.   Were the -- and I'm just going to refer to

---

3  (Pages 9 to 12)

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)

3e45e38a-3358-4c0d-9e79-86ecb951376e

AVANGARDCHIK vs RAJA MANAGEMENT                           06/29/2020
ERIN FUCHS

---

Page 13

1    the Employee Compliance Training Program as the
2    employee training policies if that's all right.  Try to
3    make it easier on us.
4        A.  Okay.
5        Q.  Was the employee training policies created on
6    your computer?
7        A.  Yes.
8        Q.  So we would be able to know when they were
9    actually created, correct?
10       A.  Yes.
11       Q.  Okay.
12           MS. SILVA:  Darren, if you have, just so I
13       can track, like a Bates number or anything of what
14       document you're referring to?
15           MR. NEWHART:  Sure.  This is -- I can
16       actually pull it up for you.  Hold on one moment.
17       And for the record, this has already been marked
18       Plaintiff's Exhibit 3.  And it's titled The
19       Employee Compliance Training Program.  And it's
20       Bates labeled FTL00029 to 34.
21   BY MR. NEWHART:
22       Q.  Are you familiar with these documents,
23   Plaintiff's Exhibit 3, Ms. Fuchs?
24       A.  Yes.
25       Q.  Okay.  And you helped create this document,

---

Page 14

1    correct?
2        A.  Yes.
3        Q.  Do you know if it was amended recently?
4        A.  No.
5        Q.  Was it amended in 2018?
6        A.  No.  I don't think so.
7        Q.  Was it updated in 2018?
8        A.  The training document that you showed me, no.
9        Q.  So there was other documents that were
10   updated in 2018?
11       A.  We have all kinds of documents that we update
12   all the time.
13       Q.  Good point.  Were there -- let me -- let me
14   do it this way.  Were there other policies and
15   procedures in place in 2018 other than the employee
16   training policies?
17       A.  So that's a part of other training material,
18   yeah.
19       Q.  Okay.  And I'm assuming that the other
20   training material is specific to each department,
21   right?
22       A.  Yes.  We have all kinds of training material.
23   So...
24       Q.  So there would be specific policies and
25   procedures for collections, the collections department?

---

Page 15

1        A.  Yes.  But those policies and procedures also
2    apply.
3        Q.  I'm sorry?
4        A.  Those policies and procedures also apply.
5    Some things are interdepartmental and some things are
6    unique to just that department.
7        Q.  Okay.  And so for the collections department,
8    would the employee training policies apply?
9        A.  Yes.
10       Q.  And those were in place in 2018?
11       A.  Yes.
12       Q.  What other policies or procedures were in
13   place for the collections department in 2018?
14       A.  I don't know off the top of my head, but I
15   could gather stuff.  I just don't know what exactly was
16   in place in 2018 just off the top of my head, and I
17   didn't prepare for that.
18       Q.  Would those be on your computer as well?
19       A.  Yes.
20       Q.  Do you know if they were written down in
21   2018?
22       A.  Yes.  We always have different documents and
23   guides that our team uses to help them do their job
24   effectively.
25       Q.  Hold on one moment.  I'm going to pull back

---

Page 16

1    up the policies and procedures.  Are you able to see
2    the screen in front of you, Ms. Fuchs?
3        A.  Yes.
4        Q.  Now within Plaintiff's Exhibit 3 is also the
5    consumer complaint management, I guess for lack of a
6    better phrase, policies and procedures as well,
7    correct?
8        A.  Yes.
9        Q.  So what we were just talking about, would
10   that be included in the collections policies and
11   procedures?
12       A.  Yes.
13       Q.  Now other than the consumer complaint
14   management and the employee policies and procedures,
15   are there any other policies or procedures for the
16   collections department in 2018?
17       A.  Like I said, I don't know.  I don't remember
18   off the top of my head.
19       Q.  Okay.  The customer service department, would
20   the employee compliance policies also apply in 2018?
21       A.  Yes.
22       Q.  Do you know if there were any other policies
23   or procedures in place for the customer service
24   department in 2018?
25       A.  Yes, we have lots of training material and

---

4  (Pages 13 to 16)

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)                                3e45e38a-3358-4c0d-9e79-86ecb951376e

AVANGARDCHIK vs RAJA MANAGEMENT                           06/29/2020
ERIN FUCHS

Page 17

1   policies in place.
2       Q.  And can you identify those policies and
3   procedures, please.  And I'm referring to the customer
4   service department for 2018.
5       A.  Sure.  So -- so much of the collections
6   department, I don't remember all the individual
7   documents and practices and policies that we've had in
8   place, but we always have guides available for our team
9   so that they can do their job most effectively.
10      Q.  And do you know if those were written down in
11  2018?
12      A.  Yep.
13      Q.  Okay.  I believe you answered this but I'm
14  not a hundred percent sure.  Was the Employee
15  Compliance Training Program updated in 2018?
16      A.  This document right here?
17      Q.  Oh, is that what you're -- are you looking at
18  the policies and procedures?
19      A.  I have the consumer complaint management
20  policy document pulled up.
21      Q.  Oh, okay.  Oh, what's in front of the
22  computer, correct?
23      A.  That's the one you're presenting?
24      Q.  Yes.
25      A.  Yes.

Page 18

1       Q.  I'm sorry.  I saw you looking down.  I
2   thought you were looking at another document.
3       A.  Oh, no.  I don't have any documents.  I'm
4   just looking at my hands.
5       Q.  Okay.  So was the Employee Compliance
6   Training Program updated in 2018?
7       A.  The consumer complaint one that you just
8   showed me was.
9       Q.  Okay.  Can you describe how the consumer
10  complaint management was updated in 2018?
11      A.  Sure.  So we put in more guidance for our
12  team in followup dates and timeframes.  So just better
13  at defining who does what, when with our consumer
14  complaint process.  So we designated people responsible
15  for, you know, following up, and then timeframes within
16  which we need to follow-up.
17      Q.  And what was the purpose in updating these
18  policies?
19      A.  Just to better improve our, you know,
20  customer experience.
21      Q.  Do you know when in 2018 they were updated?
22      A.  No, I don't.  I have to go and look.  It was
23  2018 or 2019.  Sorry.  I said yes to 2018, but I
24  actually don't know if it was 2018 or 2019.
25      Q.  Let's do this.  Are you able to see the

Page 19

1   document in front of you?
2       A.  Right.  Yes, I can.
3          MR. NEWHART:  This will be Plaintiff's
4   Exhibit 25 for the record.  And it is Bates labeled
5   FTL066.
6        (Plaintiff's Exhibit No. 25.)
7   BY MR. NEWHART:
8       Q.  Is this what was added to the customer
9   complaint policies?
10      A.  Yeah, this is the evolution of the customer
11  complaint process.  So this is our newest most current
12  version.
13      Q.  Okay.  And from discovery responses FTL's
14  indicated that this was updated in 2019.
15      A.  2019.  Okay.
16      Q.  Yep.  Do you know who was involved in
17  updating the contractor complaint process?
18      A.  Yeah, we have a very collaborative
19  environment.  So it was a handful of, you know, me and
20  Todd, as well as the department leaders and both
21  managers and team leads.
22      Q.  And, then, is it fair to say that this -- the
23  updated contractor complaint process was updated to
24  specifically address customer complaints involving
25  contractors not performing work?

Page 20

1       A.  Right.  Yep.  It's more specific.  That was
2   specifically identified in this complaint process.
3       Q.  Were there any other updates to the complaint
4   process other than Plaintiff's Exhibit 25?
5       A.  No.  This is the current updated process.
6       Q.  Okay.  Now do you think the Employee
7   Compliance Training Program and the policies and
8   procedures within them are important to FTL?
9       A.  Yes.
10      Q.  Why do you think they're important?
11      A.  So that we can deliver the best process
12  possible, or experience possible to our customers.
13      Q.  And can you elaborate on that a little bit
14  more for me, please?
15      A.  So we want our customers -- we want
16  consistency with how our customers experience us, and
17  to ensure that everything gets resolved.  Everything
18  they need.
19      Q.  What do you mean "everything gets resolved"?
20  Are you talking about complaints?
21      A.  Well, this one specifically is the contractor
22  complaint process.  So with this, yes.  With the rest
23  of the document, it ensures that FTL adheres to our --
24  the federal lending regulations.  It explains those so
25  that the contract -- I'm sorry -- so that the employee

5  (Pages 17 to 20)

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)                    3e45e38a-3358-4c0d-9e79-86ecb951376e

AVANGARDCHIK vs RAJA MANAGEMENT                                06/29/2020
ERIN FUCHS

---

Page 21

1   is educated on what those are.
2        Q.  And can you repeat that?  I'm sorry.  You
3   kind of broke up there when I was changing the screen.
4        A.  Sure.  So the part you were just showing me
5   was specific to the complaint process, but the
6   compliance training program is designed to educate the
7   customer on the federal regulations that we're held to
8   so they're informed on how to treat the customer.
9        Q.  And how are FTL's employees supposed to treat
10  the customer?
11       A.  Respectfully.
12       Q.  And you'd agree that FTL's employees should
13  follow federal and state consumer protection laws when
14  dealing with customers as well, correct?
15       A.  I do agree.
16       Q.  Okay.  Would you agree that FTL's policies
17  and procedures also help prevent consumers from being
18  needlessly harmed?
19       A.  I do.
20       Q.  In 2018 did FTL have any policies or
21  procedures for verifying information it reported to
22  credit reporting agencies?
23       A.  What do you mean?  I don't understand your
24  question.
25       Q.  In 2018 FTL reported information to credit

---

Page 22

1   reporting agencies about consumers, right?
2        A.  Right.
3        Q.  Did it have, and by "it" I mean FTL, did FTL
4   have any policies or procedures to verify the
5   information before it reported it to the credit
6   reporting agencies?
7        A.  I don't know.
8        Q.  Do you know who would know at FTL?
9        A.  Todd Grzybinski would know.
10       Q.  Would that type of policy or procedure be in
11  any of the documents we've looked at today?
12       A.  No.
13       Q.  Do you know what other documents they would
14  be in?
15       A.  No.
16       Q.  Do you know if those policies or procedures
17  exist at all?
18       A.  No, I don't know.
19       Q.  In 2018 did FTL have any policies or
20  procedures to prevent inaccurate credit reporting?
21       A.  I don't know.
22       Q.  Do you know what documents would help remind
23  you of whether or not FTL had policies or procedures to
24  prevent inaccurate credit reporting?
25       A.  No, I don't know what documents would remind

---

Page 23

1   me.
2        Q.  Would they be on your computer if they
3   existed?
4        A.  No.  I have not created a document about
5   verifying the accuracy of credit reporting.
6        Q.  Okay.  Before you became employed at FTL,
7   were there any policies or procedures in place for
8   inaccurate credit reporting?
9        A.  Not that I know of.
10       Q.  And you haven't created any since you became
11  employed at FTL, correct?
12       A.  To verify the accuracy of credit reporting...
13  No.
14       Q.  And that would also apply to prevent
15  inaccurate credit reporting?
16       A.  Correct.
17       Q.  Does FTL train its employees to know what a
18  binding contract is?
19          MS. SILVA:  Object to the form.
20          THE WITNESS:  What's that?
21          MR. NEWHART:  I'm sorry?
22          MS. SILVA:  I was objecting to the question.
23  You can answer.
24          THE WITNESS:  Does FTL train its employees to
25  know what a binding contract is...  I don't know

---

Page 24

1   how to answer that.  I don't know.
2   BY MR. NEWHART:
3        Q.  Does FTL have any policies or procedures to
4   inform its employees on what a binding contract is?
5        A.  I don't think so.  I don't know.
6        Q.  Is it normal for FTLs employees to -- strike
7   that.
8           Would you consider trying to collect a debt
9   for work that was not performed to be an unfair act?
10          MS. SILVA:  Object to the question.
11          THE WITNESS:  Am I supposed to answer?
12          MS. SILVA:  Yeah, you can answer.
13          MR. NEWHART:  Yes.  Your counsel, she'll
14  object.  Unless she tells you not to answer, you
15  can go ahead and answer.
16          THE WITNESS:  Good stuff.  All right.  Can
17  you repeat that?
18          MR. NEWHART:  Madam court reporter, would you
19  mind repeating the question, please.
20          (Whereupon, the reporter read
21          from the record as requested.)
22          THE WITNESS:  Yes.
23  BY MR. NEWHART:
24       Q.  Would reporting a negative account to a
25  credit reporting agency for work that was not performed

---

                                        6  (Pages 21 to 24)

Electronically signed by Mary Hengstler (501-151-220-3837)                                    3e45e38a-3358-4c0d-9e79-86ecb951376e
Electronically signed by Mary Hengstler (501-151-220-3837)

AVANGARDCHIK vs RAJA MANAGEMENT                                   06/29/2020
ERIN FUCHS

---

Page 25

1   be an unfair act?
2       MS. SILVA:  Object.  Legal conclusion.  You
3   can answer.
4       THE WITNESS:  Yes.
5   BY MR. NEWHART:
6       Q.  Would trying to collect a debt for work that
7   was not performed be a deceptive act?
8       MS. SILVA:  Same objection.
9       THE WITNESS:  Yes.
10  BY MR. NEWHART:
11      Q.  Would reporting a negative account to a
12  credit reporting agency for work that was not performed
13  be a deceptive act?
14      MS. SILVA:  Same objection.
15      THE WITNESS:  I don't know that question
16  was different than the last question.
17  BY MR. NEWHART:
18      Q.  Before I was speaking about deceptive acts --
19  or excuse me -- unfair acts.  And now I'm speaking
20  about deceptive.
21      A.  Okay.  But you said deceptive in two
22  questions.
23      Q.  Maybe I misspoke.  Would reporting a negative
24  account to a credit reporting agency for work that was
25  not performed be a deceptive act?

---

Page 26

1       A.  Yes.
2       MS. SILVA:  Same objection.
3       THE WITNESS:  Sorry.  Yes.
4       MS. SILVA:  And I objected to the question.
5   And your answer was, Erin?
6       THE WITNESS:  Yes.
7   BY MR. NEWHART:
8       Q.  Okay.  Should a sales financing company make
9   sure a consumer has received all material financing
10  disclosures before it tries to collect a debt from
11  them?
12      MS. SILVA:  Object as a legal
13  characterization.  You can answer.
14      THE WITNESS:  Yes.
15  BY MR. NEWHART:
16      Q.  And why do you think that's important?
17      A.  So a customer understands their loan.
18      Q.  Would you agree that a customer understanding
19  their loan would help prevent that customer from being
20  needlessly harmed?
21      MS. SILVA:  I'll object to the extent that,
22  you know, that phrase is being used.  You can
23  answer.
24      THE WITNESS:  Yes.  But I kind of forget the
25  question.  Sorry.  Can you repeat it?

---

Page 27

1       MR. NEWHART:  Miss court reporter, do you
2   mind repeating the question?
3       (Whereupon, the reporter read
4       from the record as requested).
5       THE WITNESS:  It would help, yes.
6   BY MR. NEWHART:
7       Q.  Do you agree that a financing company should
8   make sure that consumers have received accurate and
9   truthful financing disclosures about their loan?
10      A.  Yes.
11      Q.  And why do you think that's important?
12      A.  The same reason.  So they understand their
13  loan.
14      Q.  Do you agree that a financing company should
15  train contractors selling the financing company's
16  products on how to give accurate and truthful financing
17  disclosures?
18      A.  Yes.
19      Q.  Would you agree that a financing company must
20  report accurate and truthful information to credit
21  reporting agencies?
22      A.  Yes.
23      Q.  Would you agree that a financing company
24  should have policies and procedures in place to verify
25  the information it reports to credit reporting

---

Page 28

1   agencies?
2       MS. SILVA:  I'll object to what you mean by
3   "verified."  But you can answer.
4       THE WITNESS:  Yeah, I'm not sure what you
5   mean by verified too.  I just --
6   BY MR. NEWHART:
7       Q.  Well, how do you -- how do you interpret the
8   phrase verify?  Or not the phrase, the word verify.
9   Excuse me.
10      A.  Sure.  Check.  At a minimum would be check.
11      Q.  Okay.  So do you think a financing company
12  should have policies and procedures in place to check
13  the accuracy of the information it's reporting to
14  credit reporting agencies?
15      A.  I don't know how that could take place, but
16  any consumer protection is a -- is a good consumer
17  protection.  So I'd have to think that through to
18  actually develop something like that.  But it's not a
19  bad idea.
20      Q.  Well, I would agree.  Do you think a
21  financing company should have policies and procedures
22  in place to prevent inaccurate credit reporting?
23      A.  Yes.
24      MS. SILVA:  Object.
25      MR. NEWHART:  I'm sorry?

---

                                        7  (Pages 25 to 28)

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)                                    3e45e38a-3358-4c0d-9e79-86ecb951376e

AVANGARDCHIK vs RAJA MANAGEMENT                                      06/29/2020
ERIN FUCHS

Page 29

1       MS. SILVA: I was just objecting.  You can
2    answer.
3       THE WITNESS: Yes.
4    BY MR. NEWHART:
5       Q.  Okay.  Do you think it'd be unfair to report
6    inaccurate information on a customer's credit report?
7       MS. SILVA: Object to the -- I'm sorry.
8    Object to the extent it's a legal conclusion.  You
9    can answer.
10      THE WITNESS: Yes.
11   BY MR. NEWHART:
12      Q.  Do you think it would be a deceptive act to
13   report inaccurate credit information on a customer's
14   credit report?
15      MS. SILVA: Same objection.
16      THE WITNESS: If the -- yeah, if the
17   financing company knew that it was incorrect or
18   inaccurate, yes.
19   BY MR. NEWHART:
20      Q.  Would you agree that in order for the
21   financing company to know whether it was inaccurate
22   they would have to have -- or they would have to take
23   steps to check the information before its reported to
24   the credit reporting agency?
25      A.  Yes.

Page 30

1       Q.  Okay.  So you would agree that a customer
2    should receive accurate and complete disclosures about
3    the financing company's financing product, correct?
4       MS. SILVA: Object.  Legal conclusion.
5       THE WITNESS: Yes.
6    BY MR. NEWHART:
7       Q.  And you would also agree that contractors
8    should be trained to provide accurate and truthful
9    financing disclosures to customers, right?
10      A.  Yes.
11      Q.  Would you agree that a financing -- sounded
12   like someone was speaking.  Oh, it must have been an
13   echo.  I'm sorry.
14      Would you agree that a financing company
15   should have policies or procedures in place to handle
16   customer complaints about work that was never fully
17   performed?
18      A.  Yes.
19      Q.  You also agree that a financing company
20   should not enforce a contract unless it knows for
21   certain that the work was performed?
22      A.  Yes.
23      Q.  Now the policies and procedures we've
24   previously spoken about all -- well, I shouldn't say
25   all -- but within their respective departments those

Page 31

1    employees should follow those policies and procedures,
2    correct?
3       A.  Yes.
4       Q.  Okay.  What type of disciplinary actions does
5    FTL take if employees -- and by employees I'm
6    specifically referring to customer service employees --
7    but what type of disciplinary action does FTL take when
8    its policies and procedures aren't followed?
9       A.  I don't -- I don't know.  I'm sorry.  I'm not
10   struggling with that question.  Disciplinary actions on
11   our employees...
12      Q.  Let's back up.  Does FTL have disciplinary
13   policies with respect to its employees?
14      A.  Right.  So FTL's culture does not have a,
15   like -- we don't have a culture of a strict
16   disciplinarian-type company.  So we consistently give
17   feedback and grow our employees.  So there would be
18   one-on-one coaching.
19      Q.  What type of one-on-one coaching?  Can you
20   elaborate on that a little bit?
21      A.  Sure.  So we conduct call reviews so that
22   employees can hear themselves and provide coaching
23   comments on how they could have performed better in the
24   call.  Our teams very receptive and collaborative and
25   engaged in growth and improving.  So they respond well

Page 32

1    to positive reinforcement and constructive feedback.
2       Q.  So what you were just describing, that would
3    pretty much encompass the, quote, unquote, disciplinary
4    procedures that FTL follows?
5       A.  Yes.  FTL also has a handbook that outlines
6    the type of actions that our -- create discord and
7    must, you know, be avoided.  But I think much more
8    serious than what would be covered in a one-on-one
9    coaching session.  Pretty traditional handbook stuff.
10      Q.  Okay.  So the handbook that you were just
11   describing, is that different than the employee
12   compliance training manual or policy?
13      A.  Yeah.  We have like an employee handbook that
14   pertains to -- it's not necessarily like policy and
15   procedure, it's like, I don't know, handbook stuff.
16   So, like, outlining, I guess, more from like an HR
17   perspective rather than a process perspective.
18   Operations perspective.
19      Q.  Does the handbook have examples of things
20   that employees should not do?
21      A.  Yeah.
22      Q.  What type of examples, if you can remember,
23   would be in the handbook?
24      A.  I mean, I don't know.  I don't remember the
25   handbook off the top of my head.

8  (Pages 29 to 32)

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)                                    3e45e38a-3358-4c0d-9e79-86ecb951376e

AVANGARDCHIK vs RAJA MANAGEMENT                        06/29/2020
ERIN FUCHS

Page 33

```
 1       Q.  Was the handbook --
 2       A.  Like don't have firearms on the premises and
 3   you know, stuff like that.
 4       Q.  Would the handbook involve interactions with
 5   customers?
 6       A.  No.
 7       Q.  Was the handbook in place in 2018?
 8       A.  Yes.
 9       Q.  And the handbook applies to collections
10   employees?
11       A.  All employees.
12       Q.  All employees.  Okay.
13       A.  I should say too that I don't think it has
14   anything about the customers, but, like I said, I don't
15   remember the handbook front to back so...
16       Q.  Okay.
17       A.  More about how an employee can better
18   themselves.
19       Q.  In 2018 did FTL have procedures in place for
20   a situation where a customer called in and complained
21   about work not performed?
22       A.  Yes.
23       Q.  Were those procedures written down?
24       A.  Yes.
25       Q.  Where were they written down at?
```

Page 34

```
 1       A.  You just showed them to me not long ago.
 2       Q.  And for reference, Plaintiff's Exhibit 25,
 3   which is FTL066.  -- I don't know if that's in front of
 4   you.  Hold on one second.  I'm sorry.  Still trying to
 5   learn how to share screens on Zoom.
 6       Are you able to see Plaintiff's Exhibit 25?
 7       A.  This isn't the one I'm talking about.  It's
 8   the one that you showed me before this.  This is it.
 9       Q.  Okay.  So the consumer complaint management,
10   is that what you're referring to right now?
11       A.  Yeah.  So what was your original question?
12       Q.  Whether FTL in 2018 had policies or
13   procedures in place for a situation involving a
14   customer complaining about a contractor not performing
15   work?
16       A.  Right.  Okay.  Yes.  This is it.
17       Q.  Can you show -- and for reference, you're
18   speaking about the consumer complaint management,
19   correct?
20       A.  Correct.
21       Q.  Are you also speaking about the Employee
22   Complaint Training Program; would that encompass your
23   answer as well?
24       A.  Yes.
25       Q.  I know you can't move this document, but do
```

Page 35

```
 1   you know where within either the Employee Compliance
 2   Training Program or the consumer complaint process it
 3   refers to a contractor or customer complaints not
 4   performing work?
 5       A.  Yeah, can you scroll down.  I'll show you.
 6       Q.  Okay.  Just tell me when to stop.
 7       A.  Okay.  Okay.  Stop.  So here it's defined
 8   that a consumer -- what a consumer complaint is and how
 9   to recognize it.  So a contractor stating that they
10   completed work and then not, so having lied about what
11   they did, would be defined as deceptive.  And that's in
12   this document here.
13       Q.  Okay.  So in the situation that you were just
14   describing, what is a customer service representative
15   supposed to do once they receive the customer complaint
16   about the situation that we were just talking about?
17       A.  Are we -- in 2018 or today?
18       Q.  2018.  I'm sorry.
19       A.  They would tell their customer service
20   manager.
21       Q.  What else?
22       A.  They would collect details of the situation
23   and communicate that to their customer service manager.
24       Q.  What else would happen after that?
25       A.  The customer service manager would work to
```

Page 36

```
 1   resolve the situation.
 2       Q.  What does FTL mean when it says work to
 3   resolve the situation?
 4       A.  In 2018?
 5       Q.  Correct.
 6       A.  It was not further defined.
 7       MS. SILVA:  All right.  And I'm just
 8   objecting that she's not the corporate rep when you
 9   say what does FTL mean.  She's not the corporate
10   rep.
11       MR. NEWHART:  Correct.  She's not the
12   corporate rep.  She did help design these policies
13   and procedures.
14   BY MR. NEWHART:
15       Q.  So for the situation involving work not
16   performed or after contractor lying, you would agree
17   that FTL should not thereafter try and collect a debt
18   from the customer, correct?
19       A.  Yes.  If -- once that's been resolved and
20   verified.
21       Q.  Can you explain what you mean by resolved or
22   verified?  And would you like me to leave this document
23   up still or?
24       A.  Sure.  Yes.  So what I mean is that FTL has
25   to do its due diligence to further understand the
```

                                    9  (Pages 33 to 36)

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)                    3e45e38a-3358-4c0d-9e79-86ecb951376e

AVANGARDCHIK vs RAJA MANAGEMENT                06/29/2020
ERIN FUCHS

Page 37

1  situation in order to know what to do next.
2      Q.  Can you explain what you mean by "due
3  diligence"?
4      A.  Sure.  So gather information about the
5  situation from all parties.
6      Q.  In 2018 if FTL couldn't definitively know
7  whether or not the contractor performed the work, what
8  was it supposed to do to resolve the situation?
9      A.  Promote communication between the two parties
10  so that they could understand what took place and they
11  communicate back to FTL Finance what took place.
12      Q.  If FTL -- and, again, I'm talking about
13  2018 -- if FTL couldn't figure out whether or not the
14  contractor had performed the work, should it cancel the
15  contract?  Or should it have cancelled the contract?
16      A.  FTL's committed to resolving it.  So figuring
17  out what actually happened.  Communication.
18      Q.  Okay.  But should FTL have cancelled the
19  contract?  Or should FTL cancel the contract?
20      MS. SILVA:  I'll object.
21      THE WITNESS:  I think they should cancel the
22      contract if they knew for sure what happened.
23  BY MR. NEWHART:
24      Q.  So if FTL doesn't know for sure what
25  happened, you think they should be allowed to try and

Page 38

1  collect the debt from the customer?
2      MS. SILVA:  Same objection.
3      THE WITNESS:  Until it's resolved -- until
4      the situation's resolved, I think it should follow
5      the normal course of action.  That did not lend in
6      the contract.
7  BY MR. NEWHART:
8      Q.  And why is that?
9      A.  Because the contract is in place to -- I
10  mean, the contract decides what should happen next.  I
11  mean, it's the account that was created as a result of
12  everyone agreeing to that.  That's what a contract is.
13      Q.  Does FTL provide financing for work that a
14  contractor has not performed?
15      A.  No.
16      Q.  Does FTL provide financing for work that a
17  contractor has only half performed?
18      A.  No.
19      Q.  So you would agree that most contracts -- or
20  actually back up.  You would agree that all contracts
21  that FTL provides financing for, the work should be
22  performed, correct?
23      A.  Yes.
24      Q.  So what you were just describing about being
25  outlined in the contract wouldn't necessarily have

Page 39

1  taken place because the work hadn't been performed,
2  right?
3      MS. SILVA:  I'll object.  Speculation.  I'm
4      not really sure what the facts are that these
5      questions are being -- like, what the scenario is
6      anymore.
7      THE WITNESS:  Yeah, I'm a little confused.
8  BY MR. NEWHART:
9      Q.  Okay.  Well, I guess let me ask it this way.
10  You said that FTL should follow what's outlined in the
11  contract when it can't resolve or determine whether or
12  not a contractor has performed the work, right?
13      A.  Yes.
14      Q.  So what do you mean by FTL should follow
15  what's outlined in the contract if the contract
16  involves -- let me rephrase that.
17      Let me just ask what you mean by how FTL
18  should follow what's outlined in the contract?
19      A.  Sure.  So the contract is confirmation that
20  the work was completed.  The conversation that happens
21  after that left unresolved didn't trigger -- shouldn't
22  trigger anything until there's resolution.  But the
23  contract is validation that the work was completed.  So
24  until we know differently, we're just working to
25  resolve with the customer and the contractor.

Page 40

1      Q.  Okay.  So what happens when FTL can't
2  validate whether the work was performed?
3      A.  The contract validates whether the work was
4  performed.
5      Q.  And you would agree that there's situations
6  where a contractor could falsify a customer's signature
7  and say the work was performed when it wasn't, right?
8      A.  No.  I -- we have steps in place to ensure
9  that the consumer -- that a contractor's not falsifying
10  a consumer's signature.
11      Q.  Can you describe those steps for me, please.
12      A.  Sure.  We have an identity verification.
13      Q.  Anything other than the identity
14  verification?
15      A.  Nope.  That's what --
16      THE REPORTER:  I'm sorry, can you repeat
17      that?
18      THE WITNESS:  The identity verification
19      confirms that it's that customer's signature.
20  BY MR. NEWHART:
21      Q.  So you're familiar with the dispute that's
22  going on between Mr. Walters and FTL, right?
23      A.  Right.
24      Q.  Would you agree that the work was not
25  performed at Mr. Walters' home?

                                    10  (Pages 37 to 40)

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)                3e45e38a-3358-4c0d-9e79-86ecb951376e

AVANGARDCHIK vs RAJA MANAGEMENT                                    06/29/2020
ERIN FUCHS

Page 41

1    A.  Yes.
2    Q.  Would you agree that the contract and the
3  identity verification that you're speaking about was
4  completed by Fast AC and sent to FTL?
5    A.  Yes.
6    Q.  So you would also --
7    A.  Wait.  Wait.  Can you ask that question
8  again?  I don't know that I processed it before saying
9  yes.
10    Q.  That's okay.  The identity verification that
11  you were talking about previously, that happened in
12  Mr. Walters' case, correct?
13    A.  Yes.
14    Q.  Okay.  Would you agree that the work was not
15  performed but the identity verification was completed
16  and sent to FTL?
17    A.  Yes.  By Mr. Walters.  Not by Fast AC.  I
18  thought you had said Fast AC in the last time you said
19  that question.
20    Q.  Well, Fast AC performed the application for
21  Mr. Walters?
22    A.  Okay.
23    Q.  And sent it to FTL.  So Mr. Walters didn't
24  send it to FTL.  At any rate,  would you agree that --
25    A.  The credit application?

Page 42

1    Q.  I'm sorry.  Go ahead.
2    A.  The loan contract or the credit application?
3    Q.  Both.
4    A.  Okay.
5    Q.  So you would agree that there are situations
6  where the identity verification can happen but yet the
7  contractor still hasn't performed the work, right?
8    A.  Yes.  But I'm still a little bit unclear on
9  what your -- how you're describing the scenario itself.
10    I do believe that Mr. Walters completed the
11  identity verification and signed the documents.
12  Although the work had not taken place.
13    Q.  Okay.  I think you kind of understand.  And,
14  again, if I'm asking unclear questions, which I have a
15  tendency to do, there's no question, please just let me
16  know and I'll try and rephrase it to make it more clear
17  for you.
18    A.  Okay.
19    Q.  Are you aware of other customer complaints
20  about contractors not performing work?
21    A.  None specifically.  I'm sure there are some.
22  But I'm not -- I don't know the details.
23    Q.  Would you be able to identify those customer
24  complaints within, I guess, Sales Force?
25    A.  Yes.

Page 43

1    Q.  I'm just going to back up for a moment on
2  your job responsibilities or the authority that you
3  have as a -- and I apologize, I forget the title of
4  your job.
5    A.  Operations manager.
6    Q.  Operations manager.  Thank you.
7    In 2018 as an operations manager, did you
8  have the authority to stop debt collection letters from
9  being sent out?
10    A.  Yes.
11    Q.  Did you have the authority to prevent credit
12  reporting on a customer's credit report?
13    A.  Yes.
14    Q.  Did you have the authority to pull funds from
15  a contractor's account?
16    A.  Yes.
17    Q.  Did you also have the authority to cancel a
18  contract?
19    A.  Yes.
20    Q.  Okay.  If we could take a five minute break.
21  Off the record.  Sorry.
22    (Off the record.)
23  BY MR. NEWHART:
24    Q.  All right.  Are we all ready?
25    A.  Yes.

Page 44

1    Q.  Hold on one more moment.
2    Ms. Fuchs, do you recall when you became
3  aware of the dispute between Mr. Walters, Fast AC and
4  FTL?
5    A.  No, I don't.
6    Q.  Do you recall -- well, let me just do it this
7  way.  FTL issued the loan to Mr. Walters on
8  October 19th, 2018.  The invoice for the work was 5,500
9  but FTL paid Fast AC $5,321.25.
10    Do you know why FTL paid less than the
11  invoiced amount?
12    A.  No, I don't.
13    Q.  Does FTL keep any type of fee from a
14  contractor for work or for financing?
15    A.  Sometimes.
16    Q.  And how much is that fee?
17    A.  It's different.  There is not a set amount.
18  It's variable.
19    Q.  Do you know what those variables are?
20    A.  No, not off the top of my head.
21    Q.  Do you recall the phone calls that took place
22  between Fast AC and FTL on November 7th, 2018?
23    A.  No, I don't remember.
24    Q.  Have you listened to those phone calls at
25  all?

11  (Pages 41 to 44)

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)                                    3e45e38a-3358-4c0d-9e79-86ecb951376e

AVANGARDCHIK vs RAJA MANAGEMENT                        06/29/2020
ERIN FUCHS

Page 45

1      A.  I have listened to them but not in a long
2  time.
3      Q.  Okay.  Let's try this.  One moment.
4          Ms. Fuchs, are you able to see the screen in
5  front of you?
6      A.  Yes.
7      Q.  And for the record, this is Plaintiff's
8  Exhibit 24 which has already been identified, and it's
9  Bates labeled FTL068 through 075.  And if you could
10 just review -- well, let me ask this.  These are notes
11 from FTL's software Sales Force about Mr. Walters'
12 account, correct?
13     A.  Correct.
14     Q.  Okay.  And the first note that's in front of
15 you was created on November 7, 2018, right?  If you
16 look at the bottom left hand of the screen.  Right
17 there.
18     A.  So what was the date you said?
19     Q.  November 7th, 2018.
20     A.  Yes.
21     Q.  Okay.  And the note was created by Cristina
22 Perez, correct?
23     A.  Yes.
24     Q.  Well, excuse me.  I believe it was created by
25 Elora.  And it looks like it was sent to Cristina

Page 46

1  Perez.
2      A.  No, the note was created by Cristina.
3  Cristina copied and pastes a message that Elora gave to
4  Cristina.
5      Q.  Okay.  Thank you for --
6      A.  Yeah.
7      Q.  Thank you for clarifying that.
8          And Cristina Perez was the account manager
9  for Fast AC; is that right?
10     A.  I don't remember.
11     Q.  Do you remember if Cristina Perez was an
12 account manager for FTL?
13     A.  Yes, she was.
14     Q.  Okay.  Do you know Elora's position within
15 FTL?
16     A.  Who?
17     Q.  At the time in 2018?
18     A.  Whose position?
19     Q.  Elora?
20     A.  She's a customer service representative.
21     Q.  Okay.  And I'm going to go down.
22         Do you see the note in front of you Bates
23 labeled FTL069 that was created on November 7th, 2018?
24     A.  Uh-huh.
25     Q.  And was this note created by Kyla?

Page 47

1      A.  Yes.
2      Q.  And do you know who the note was sent to or
3  was it just generally placed within the Sales Force?
4      A.  I don't know.  What you're presenting here is
5  within Sales Force.  I don't know what happened to the
6  note outside of Sales Force.
7      Q.  Okay.  Okay.  Now would you agree that the
8  note says that Matt, meaning Matt from Fast AC, did not
9  have the same story that the customer gave on
10 cancelling the job, right?
11     A.  That's what the note says, yes.
12     Q.  And below that where it says Elora's note.
13 She's referring to Mr. Walters, saying Mr. Walters said
14 that Fast AC never did any work at his home, correct?
15     A.  Yes.
16     Q.  Okay.  So you previously said that it's not
17 normal for FTL to provide financing for work that has
18 not been performed, right?
19     A.  Right.
20     Q.  Do you know if FTL received any invoices from
21 Fast AC after this phone call on November 7th?
22     A.  I don't know.
23     Q.  Now it's labeled FTL0 -- or Bates labeled
24 FTL070.  In front of you it says, "Expelled Fast AC
25 SWFL," correct?

Page 48

1      A.  Correct.
2      Q.  What does "expelled Fast AC SWFL" mean?
3      A.  Fast AC SWFL is the name of the company.
4  Expelled means that we no longer accept applications
5  from them.
6      Q.  Okay.  And why does FTL no longer accept
7  applications from Fast AC?
8      A.  We've just chosen not to keep doing business
9  with them.
10     Q.  Why did FTL choose not to continue to do
11 business with Fast AC?
12     A.  Why does FTL... Because we choose to do
13 business with partners that we trust, and in this
14 instance he was deceptive to FTL.
15     Q.  And by "this instance," you're specifically
16 referring to the dispute with Mr. Walters?
17     A.  Specifically referring to -- that he told us
18 the work was complete various times and then later told
19 us the work was not complete.
20     Q.  And we're speaking about Matt from Fast AC,
21 correct?
22     A.  Right.
23     Q.  And Matt also told FTL that the work was only
24 halfway completed, correct?
25     A.  Right.

12  (Pages 45 to 48)

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)                                    3e45e38a-3358-4c0d-9e79-86ecb951376e

AVANGARDCHIK vs RAJA MANAGEMENT
ERIN FUCHS
06/29/2020

Page 49

1    Q.   When Matt told Fast AC that the work was only
2  halfway completed, FTL had already provided the
3  financing, correct?
4    A.   Now you just said when Matt told -- when Matt
5  told Fast AC, but I think you meant when Matt told FTL?
6    Q.   Correct.
7    A.   Matt is with Fast AC.  When Matt told FTL
8  that the work was only half complete, the financing --
9  the funding had already been sent to Fast AC, yes.
10    Q.   At that point why did FTL not pull the
11  funding from Fast AC?
12    A.   Because the -- because Fast AC told us that
13  there was only a bit left to do and that they are going
14  to go complete it right away, immediately.
15    Q.   So Fast -- or excuse me.  FTL was giving an
16  exception to Fast AC from its normal practice of not
17  providing financing for work not completed?
18    A.   No, I wouldn't say an exception, because we
19  had already provided the financing.  We would not have
20  provided the financing if we had known the work was
21  only partially completed.
22    Q.   FTL's current policy would have required the
23  funds to be pulled, correct, in the situation that
24  we're talking about?
25    A.   If a contractor let's us know that the work

Page 50

1  was not complete, yes, we would just pull funds.
2    Q.   Would Fast -- or excuse me.  Would FTL also
3  cancel the contract?
4    A.   Yes.
5    Q.   But it didn't cancel the contract for
6  Mr. Walters in 2018, correct?
7    A.   Correct.
8    Q.   Did you speak with Elora on November 7th,
9  2018, concerning Mr. Walters?
10    A.   I have no idea.
11    Q.   Let's try this.  For the record, we are
12  looking at FTL Bates -- or excuse me -- Bates label
13  FTL075.  Ms. Fuchs, can you describe what this document
14  is that we're looking at?
15    A.   This is the note list on Mr. Walters' account
16  in our leasing software where we hold his loan.
17    Q.   Okay.  And can you review the highlighted
18  portion for me, please.
19    A.   Sure.  You want me to read that out loud or?
20    Q.   You can just read it to yourself.  That's
21  okay.  I just wanted to see if what's in front of you
22  helps you remember having a conversation back in
23  November, or on November 7, 2018.
24    A.   Okay.  Reviewed.
25    Q.   Does that help you remember any conversations

Page 51

1  you had back then?
2    A.   I don't remember that conversation still.
3  But I see the note.
4    Q.   Okay.  So you at least did speak with, I
5  believe it was, Elora about the situation with
6  Mr. Walters on November 7th, though, right?
7    A.   Probably.
8    Q.   Okay.  Do you recall that Mr. Walters offered
9  to do a three way call with Fast AC on November 7th,
10  2018?
11    A.   Don't recall.
12    Q.   Okay.  Do you recall that you told Elora that
13  Fast -- or FTL would not do a three way call?
14    A.   I don't recall that.  But I see it in the
15  note.  I understand it.
16    Q.   Okay.  Do you know why FTL would not want to
17  do a three way call?
18    A.   Because -- I don't know.
19    Q.   Do you recall that Mr. Walters also offered
20  to have someone come to his house and look in his attic
21  to know that no work was performed by Fast AC?
22    A.   No.  I didn't know that.
23    Q.   Do you think it would have been helpful to do
24  a three way call with Mr. Walters and Fast AC?
25    A.   Not necessarily.

Page 52

1    Q.   Why's that?
2    A.   Because they disagreed with each other about
3  the story.  I don't know that connecting and continuing
4  to disagree would have gotten us anywhere.
5    Q.   Do you recall Elora on one of the phone calls
6  telling Mr. Walters that because he signed, and by him
7  I mean there was an electronic signature, that it
8  wouldn't hold up very well because he signed the work
9  performed certificate?
10    A.   Do I recall that?
11    Q.   Do you recall hearing that on one of the
12  phone calls with Mr. Walters?
13    A.   I don't remember.
14    Q.   But you agree that FTL doesn't train customer
15  service representatives to know whether a contract has
16  been completed, correct?
17    A.   FTL trains their employees what indicates a
18  completed contract, yes.
19    Q.   Can you describe that training for me,
20  please.
21    A.   We explain our --
22       THE REPORTER:  I'm sorry.  Repeat that.
23       THE WITNESS:  We explain how our contract
24  works and that the process -- signing the contract
25  initiates fund to a contractor and creates the loan

13  (Pages 49 to 52)

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)
3e45e38a-3358-4c0d-9e79-86ecb951376e

AVANGARDCHIK vs RAJA MANAGEMENT                      06/29/2020
ERIN FUCHS

Page 53

1        for the customer.
2    BY MR. NEWHART:
3        Q.  Does FTL provide any legal training to its
4    customer service representatives on how a contract is
5    formed?
6        A.  No.
7        Q.  Does FTL provide any legal training to its
8    customer service representatives on whether a contract
9    has been breached or not?
10       A.  No.
11       Q.  Does FTL train customer service
12   representatives about customers' rights to rescind the
13   contract?
14       A.  Does FTL train the customer service
15   representatives on the right to rescind a contract...
16   No.  I would say there's not thorough training on that
17   for a customer service representative.
18       Q.  Elora was not a -- or was a customer service
19   representative, correct?
20       A.  Yes.
21       Q.  Okay.  Would you agree that just because a
22   customer signs a contract doesn't mean that he's not
23   later allowed to rescind that contract?
24       MS. SILVA:  Objection.  Calls for a legal
25       conclusion.

Page 54

1        THE WITNESS:  I don't know.
2    BY MR. NEWHART:
3        Q.  Would you agree that FTL knew on
4    November 7th, 2018, that the work at Mr. Walters' home
5    had not been fully completed?
6        A.  I don't know.
7        Q.  You would agree that Matt from Fast AC on
8    November 7th, 2018, told FTL that the work had not been
9    completed, correct?
10       A.  I don't remember.  I think one of the notes
11   earlier had.
12       Q.  And we can look at those if it helps to
13   refresh your recollection.
14       A.  Okay.  Yes.
15       Q.  Okay.  So you'd agree that FTL knew on
16   November 7th, 2018, that the work had not been
17   completed, right?
18       A.  Right.
19       Q.  Okay.
20       A.  And we presented the next course of action
21   here in this note.
22       Q.  And what you're referring to is Elora's note
23   on FTL069; is that right?  Ms. Fuchs?
24       A.  Yeah, I'm sorry.  I'm reading.
25       Q.  Oh, I'm sorry.  I didn't mean to interrupt

Page 55

1    you.  I didn't know.
2        A.  That's okay.  Yeah, so, I mean, the point
3    that he told us that the work was not fully completed
4    Todd had, within the same phone call, discussed that we
5    would need to refund the customer or the work needs to
6    be completed.  So he said that the -- he's going to
7    complete the work right away.
8        Q.  Why didn't FTL pull the funds from Fast AC at
9    this point?
10       A.  Because Matt told us that some work had been
11   completed, and the customer signed the loan document.
12   So it was up to Matt and Mr. Walters to get the work
13   finished or to get a refund -- to let us know what
14   refund we needed to process.
15       Q.  FTL eventually pulled the funds in
16   April 2019, correct?
17       A.  I don't remember.
18       Q.  And FTL eventually deleted the negative
19   credit report off of Mr. Walter -- excuse me -- deleted
20   the negative account off of Mr. Walters' credit report
21   in 2019, correct?
22       A.  I don't know when that took place, but I
23   believe it did take place.
24       Q.  Hold on one moment.  At the top of Bates
25   label FTL075.  Can you look at the highlighted section,

Page 56

1    please.
2        A.  Yes.
3        Q.  And you see that it says, "Deleted reporting
4    from credit per EF"?
5        A.  Yes.
6        Q.  Is EF you, Ms. Fuchs?
7        A.  Yes.
8        Q.  And that took place on April 17th, 2019,
9    right?
10       A.  It appears that way, yes.
11       Q.  Why did FTL wait until April 17th, 2019, to
12   delete the negative account from Mr. Walters' credit
13   report?
14       A.  I don't know.
15       Q.  You'd agree that you had the ability to
16   delete that report prior to April 17th, 2019, right?
17       A.  I did have the ability, yes.
18       Q.  And you had the ability to do that in 2018,
19   correct?
20       A.  Yes.
21       Q.  Now on the highlighted Section on FTL075, why
22   did you advise Elora to stay out of the dispute between
23   Mr. Walters and Fast AC as much as possible?
24       A.  I believe that's paraphrasing on your part.
25       Q.  Okay.

14  (Pages 53 to 56)

FLORIDA COURT REPORTING
561-689-0999

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)                                      3e45e38a-3358-4c0d-9e79-86ecb951376e

AVANGARDCHIK vs RAJA MANAGEMENT                                    06/29/2020
ERIN FUCHS

Page 57

1     A.  So the -- what I worked to do is encourage
2   our representatives to promote communication to both
3   parties so that the situation can be resolved.  And
4   that -- that's the course of action we need to take.
5     Q.  Okay.  If the situation cannot be resolved
6   like in Mr. Walters' case, why did FTL continue to
7   report a negative account on Mr. Walters' credit
8   report?
9     A.  It was in the process of becoming resolved.
10    Q.  How long is that process supposed to take?
11    A.  That wasn't defined at this point.
12    Q.  But FTL has now defined how long the process
13  should take, right?
14    A.  I believe so.  I'd have to reread that
15  document.  But I believe it's -- yeah.
16    Q.  Does 30 days sound accurate?
17    A.  Yes.
18    Q.  And the process that you're talking about
19  requires FTL to pull funds if the contractor says the
20  work has not been performed, right?
21    A.  Right.
22    Q.  Does that process also now require collection
23  letters to stop going out to the customer?
24    A.  Yes.
25    Q.  But you'll agree that FTL continued to send

Page 58

1   collection letters to Mr. Walters even though it knew
2   the work had not been fully completed?
3     A.  Yes.
4     Q.  Do you know why FTL didn't stop the
5   collection letters from going out to Mr. Walters?
6     A.  Because the situation was still in the midst
7   of being resolved.
8     Q.  So was it FTL's policy to continue sending
9   collection letters and reporting negative accounts if
10  an issue remains unresolved in 2018?
11    A.  Yes.
12    Q.  In November 2018 was FTL required to report
13  negative accounts on a customer's credit report?
14    A.  I don't know.
15    Q.  Do you know who would know at FTL?
16    A.  Todd Grzybinski.
17    Q.  Did FTL have a policy or procedure that
18  required negative accounts to be reported on a
19  customer's credit report?
20    A.  I don't know.
21    Q.  Do you know why FTL didn't flag Mr. Walters'
22  account while this dispute was pending?
23       MS. SILVA:  Object to the question.  Vague.
24       THE WITNESS:  Yeah, I don't know what you
25  mean by "flag."  That's not a thing we have.

Page 59

1   BY MR. NEWHART:
2     Q.  Well, Sales Force allows FTL to flag accounts
3   for certain things; is that right?
4     A.  We don't have work flows set up around
5   flagging accounts.
6     Q.  Okay.  Is there anything Mr. Walters could
7   have done to prevent FTL from reporting the negative
8   account on his credit report?
9     A.  I don't know.
10    Q.  Is there anything he could have done to
11  prevent FTL from sending collection letters to him?
12    A.  I don't know.
13    Q.  Did FTL benefit from reporting the negative
14  account on Mr. Walters' credit report?
15    A.  Did we benefit?
16    Q.  Correct.
17    A.  I don't think so.
18    Q.  Did FTL benefit from sending the collection
19  letters to Mr. Walters?
20    A.  I don't know.
21    Q.  Are you aware that Mr. Walters filed his
22  complaint against FTL and Fast AC on February 5th,
23  2019?
24    A.  I don't -- I don't know the timeline.
25    Q.  Okay.  Well, I can represent that it was

Page 60

1   filed on February 5th, 2019.  And you would agree that
2   the credit reporting was deleted on April 17th, 2019,
3   correct?
4     A.  Correct.
5     Q.  And was that a result of Mr. Walters filing
6   the lawsuit against FTL and Fast AC?
7     A.  I don't know that it was a direct result of
8   him filing the lawsuit.  I think at that point Fast AC
9   stopped lying, finally told the truth, and then we
10  processed the credit reporting.
11    Q.  Would you agree that Mr. Walters was telling
12  the truth the entire time?
13    A.  Yes.  That's clear now.
14    Q.  Would you agree that Mr. Walters, given his
15  condition, was trying to do everything he could to
16  prevent the credit reporting on his account, or on his
17  credit report?
18    A.  I don't know.
19       MR. NEWHART:  If we can go off real quick.
20       (Off the record.)
21  BY MR. NEWHART:
22    Q.  All right.  We can go back on.
23       Ms. Fuchs, do you agree that Mr. Walters had
24  no choice but to sue FTL to remove the negative account
25  on his credit report?

15  (Pages 57 to 60)

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)                              3e45e38a-3358-4c0d-0e79-86ecb951376e

AVANGARDCHIK vs RAJA MANAGEMENT                          06/29/2020
ERIN FUCHS

---

Page 61

1           MS. SILVA:  Object.  Calls for --
2           THE REPORTER:  Calls for.
3           MS. SILVA:  Speculation.  I'm sorry.
4           THE WITNESS:  No.
5    BY MR. NEWHART:
6           Q.   You do not agree?
7           A.   I do not agree.
8           Q.   Okay.  What else could Mr. Walters have done
9    besides suing FTL to remove the negative account on his
10   credit report?
11          A.   He could have sued Fast AC and Fast AC could
12   have admitted that they didn't do the work, because
13   once they did we resolved Mr. Walters' account.
14          Q.   But you'll agree that Fast AC was not
15   reporting the debt on his credit report, correct?
16          A.   No, we were reporting the debt according to
17   the contract that Fast AC -- between Fast AC and
18   Mr. Walters.
19          Q.   And the contract that you're referring to
20   contemplates that the work had been fully completed,
21   right?
22          A.   Yes.
23          Q.   And the work had not been fully completed,
24   right?
25          A.   Yes.

---

Page 62

1           Q.   In fact -- excuse me -- and FTL knew that the
2    work had not been fully completed, right?
3           A.   Yes.
4           Q.   But FTL continued to report the negative
5    account on his credit report, correct?
6           A.   Yes.
7           Q.   So how was Mr. Walters supposed to get that
8    removed without suing FTL?
9           MS. SILVA:  Objection.  Asked and answered.
10          THE WITNESS:  I don't know.
11   BY MR. NEWHART:
12          Q.   You would agree that Fast AC had no control
13   over whether or not FTL would report the negative
14   account on Mr. Walters' credit report, right?
15          A.   No.  If Fast AC would have told the truth,
16   that they didn't do the work, we would have not
17   reported the negative credit reporting.
18          Q.   Is there a reason why FTL believed Fast AC
19   over Mr. Walters?
20          A.   Because Mr. Walters signed a contract stating
21   that the work was complete.
22          Q.   But you'd agree that that was an E-signature,
23   correct?
24          A.   Correct.
25          Q.   Okay.  And you would agree that FTL knew in

---

Page 63

1    November 2018 that the work had not been completed,
2    right?
3           A.   Right.
4           Q.   To the best of your ability, did you handle
5    the dispute with Mr. Walters the way FTL understood
6    that you should have handled -- that was a bad
7    question.  I apologize.  Strike that question.
8           Did you handle the way -- or handle the
9    dispute with Mr. Walters the way that FTL wanted you to
10   handle it?
11          A.   Me?  Did I handle the dispute?
12          Q.   Yes, ma'am.
13          A.   Yes.
14          Q.   What about FTL's other employees, did they
15   handle the dispute the way that FTL wanted them to
16   handle it?
17          A.   Yes.
18          Q.   Do you think FTL's employees made any
19   mistakes in handling the dispute with Mr. Walters and
20   Fast AC?
21          A.   I don't know.
22          Q.   Do you think that they followed FTL's
23   policies and procedures that were in place in 2018?
24          A.   Yes.
25          Q.   Do you think FTL has any responsibility for

---

Page 64

1    the harm Mr. Walters has suffered?
2           A.   I don't know.
3           Q.   What would you need to know?
4           A.   What would I need to know if FTL has any
5    responsibility for the harm that Mr. Walters... I would
6    need time to reflect.
7           Q.   I'm sorry?
8           A.   I don't know, just like a minute to think
9    about it maybe.
10          Q.   Sure.
11          A.   If you could repeat the question.
12          Q.   Do you think FTL has any responsibility for
13   the harm Mr. Walters has suffered?
14          MS. SILVA:  Objection to the characterization
15   of the question.
16   BY MR. NEWHART:
17          Q.   And we can be more specific if you'd like.
18   Do you think FTL has any responsibility for the harm
19   Mr. Walters suffered because of the negative account
20   that appeared on his credit report?
21          MS. SILVA:  Same objection.
22          THE WITNESS:  Yes.
23   BY MR. NEWHART:
24          Q.   Do you think FTL has any responsibility for
25   the harm Mr. Walters suffered because of the debt

---

16  (Pages 61 to 64)

Electronically signed by Mary Hengstler (501-151-220-3837)                                    3e45e38a-3358-4c0d-9e79-86ecb951376e
Electronically signed by Mary Hengstler (501-151-220-3837)

AVANGARDCHIK vs RAJA MANAGEMENT                06/29/2020
ERIN FUCHS

---

Page 65

1  collection letters that were sent to him by FTL?
2       MS. SILVA: Object to the assumptions of what
3  harm he suffered.
4       THE WITNESS: Yeah, I don't know much about
5  the harm that he suffered so...
6  BY MR. NEWHART:
7       Q.  Would you agree that receiving debt
8  collection letters can cause someone stress?
9       MS. SILVA: Objection. Speculation.
10      THE WITNESS: Yes.
11  BY MR. NEWHART:
12      Q.  So would you agree that FTL has
13  responsibility for the stress Mr. Walters suffered from
14  receiving FTL's debt collection letters?
15      MS. SILVA: Objection.
16      THE REPORTER: Can you repeat that?
17      MS. SILVA: Objection about assuming, you
18      know, what Mr. -- what Mr. Walters suffered.
19      THE WITNESS: Yes.
20  BY MR. NEWHART:
21      Q.  Do you agree that FTL has responsibility for
22  the other emotional harm that Mr. Walters suffered
23  because of the debt collection letters?
24      MS. SILVA: Same objection about speculation
25      and assumption about his harm.

---

Page 66

1       THE WITNESS: I don't know anything about his
2       harm, emotional harm.
3  BY MR. NEWHART:
4       Q.  Would you agree that someone would experience
5  emotional harm from a negative account appearing on
6  their credit report?
7       MS. SILVA: Objection. Speculation.
8       THE WITNESS: I don't -- I think that's an
9       exaggeration. That wording is a bit of an
10      exaggeration of what someone might experience.
11  BY MR. NEWHART:
12      Q.  What if the credit reporting was inaccurate?
13      MS. SILVA: Same objection.
14      THE WITNESS: I could understand that it
15      would make someone upset.
16  BY MR. NEWHART:
17      Q.  So you can agree that Mr. Walters would have
18  been upset by having a negative account -- excuse me --
19  an inaccurate negative account reported on his credit
20  report?
21      A.  I do agree.
22      Q.  So you would agree that any harm that
23  Mr. Walters suffered because of that negative,
24  inaccurate account, that FTL has some responsibility
25  for it?

---

Page 67

1       A.  You cut out a little bit. Can you repeat
2  that?
3       Q.  I can rephrase it too.
4       Does FTL have any responsibility for the harm
5  caused by the inaccurate credit report appearing on his
6  account?
7       MS. SILVA: Objection.
8       MR. NEWHART: On his credit report. Excuse
9  me.
10      THE WITNESS: I'm sorry. One more time.
11  BY MR. NEWHART:
12      Q.  Do you think FTL has any responsibility for
13  any harm that Mr. Walters suffered because of the
14  inaccurate and negative account reported by FTL on his
15  credit report?
16      MS. SILVA: Objection. Legal conclusion.
17      THE WITNESS: I don't feel comfortable with
18      the word "harm." So it's hard for me to answer
19      that.
20  BY MR. NEWHART:
21      Q.  What word would you feel comfortable with?
22      A.  I mean, we talked about upset. I could
23  understand that he would be upset.
24      Q.  Okay.
25      A.  I do think FTL Finance has responsibility to

---

Page 68

1  causing that upset for Mr. Walters due to the
2  inaccurate credit reporting on his correct report.
3       Q.  Do you think that they have responsibility
4  for him becoming upset because of it?
5       A.  Yes.
6       Q.  Do you think FTL has responsibility for
7  Mr. Walters suffering anxiety because of the inaccurate
8  credit report?
9       MS. SILVA: Objection for legal conclusion
10      and speculation.
11      THE WITNESS: Yeah, I don't know how to
12      define anxiety in the situation.
13  BY MR. NEWHART:
14      Q.  How would you define anxiety?
15      A.  Kind of like panic and neurosis.
16      Q.  So do you think that FTL's responsible for
17  causing Mr. Walters' panic because of the inaccurate
18  credit report?
19      MS. SILVA: Same objection.
20      THE WITNESS: No, I don't think I would go
21      past upset. I do not think that FTL's responsible
22      for creating panic.
23  BY MR. NEWHART:
24      Q.  Okay. And why is that?
25      A.  Because I think that's an unreasonably

                           17 (Pages 65 to 68)

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)
3e45e38a-3358-4c0d-9e79-86ecb951376e

AVANGARDCHIK vs RAJA MANAGEMENT                                06/29/2020
ERIN FUCHS

---

Page 69

1    extreme response to the inaccurate credit reporting.
2         Q.  Would you agree that people experience things
3    differently, like --
4         A.  Yes.
5         Q.  -- panic?
6         A.  Yes.
7         Q.  And are you aware that Mr. Walters is elderly
8    and that he has Parkinson's disease?
9         A.  I don't know much about Mr. Walters at all.
10        Q.  Okay.  Would that change your answer knowing
11   that Mr. Walters is an elderly individual that has
12   Parkinson's disease?
13        A.  I think it's difficult for me to try to
14   experience life as anybody other than myself.
15        Q.  Okay.  Would you agree that FTL is
16   responsible for any loss of sleep that Mr. Walters had
17   because of the debt collection letters?
18        MS. SILVA:  Objection.  Legal conclusion.
19        THE WITNESS:  My response is the same as what
20   I just was talking about.  I don't --
21   BY MR. NEWHART:
22        Q.  Would you lose sleep if you received debt
23   collection letters for an inaccurate and unowed debt?
24        MS. SILVA:  Objection.  Speculation.
25        THE WITNESS:  No.  I would not --

---

Page 70

1    BY MR. NEWHART:
2         Q.  Would you lose -- I didn't mean to interrupt
3    you.  I'm sorry.
4         A.  I would not lose sleep.
5         Q.  Would you lose sleep if an inaccurate account
6    appeared on your credit report?
7         MS. SILVA:  Objection.  Speculation.
8         THE WITNESS:  I would be upset.  I would not
9    lose sleep.
10   BY MR. NEWHART:
11        Q.  Would you agree that an inaccurate negative
12   account lowers a credit score?
13        A.  Yes.
14        Q.  So you would agree that Mr. Walters' credit
15   score was lowered because of the inaccurate account FTL
16   reported?
17        MS. SILVA:  Objection.  Speculation.
18        THE WITNESS:  Probably.
19   BY MR. NEWHART:
20        Q.  Would you agree that the purpose of FTL
21   placing -- strike that.
22        Would you agree that the purpose of FTL's
23   credit reporting is to influence someone to pay a debt?
24        Well, let me ask it this way.  What is the
25   purpose of FTL's credit reporting?

---

Page 71

1         A.  FTL reports the payment behavior of our
2    borrowers so that other borrowers -- so that other
3    lenders understand the payment behaviors of their
4    potential borrower.
5         Q.  So you would agree that an inaccurate
6    accounting being reported by FTL would not reflect the
7    payment behaviors of that borrower, right?
8         MS. SILVA:  Objection.  Speculation.
9         THE WITNESS:  Inaccurate accounting being
10   reported would not reflect the payment behaviors of
11   that borrower.  Correct.
12        MR. NEWHART:  I think that's all I have.
13        MS. SILVA:  I don't have any questions.
14        MR. NEWHART:  Thank you for your time,
15   Ms. Fuchs.
16        THE WITNESS:  You're welcome.
17        MS. SILVA:  And how do we -- you're good,
18   Erin.  How do we place an order for the transcript?
19        THE REPORTER:  You can just let me know.
20        MS. SILVA:  Okay.
21   (Proceedings were concluded at 12:06 p.m.)
22
23
24
25

---

Page 72

1              CERTIFICATE OF OATH
2
3    STATE OF FLORIDA
4    COUNTY OF PALM BEACH
5
6         I, Mary Hengstler, the undersigned authority,
7    certify that ERIN FUCHS remotely appeared before me and
8    was duly sworn.
9
10        WITNESS my hand and official seal this 13th day of
11   July, 2020.
12
13
14
15
16
17
18
19   _____
20   Mary Ann Hengstler
21   Notary Public, State of Florida
22   My Commission #GG909645
23   Expires: December 23, 2023
24
25

---

FLORIDA COURT REPORTING
561-689-0999

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)

3e45e38a-3358-4c0d-9e79-86ecb951376e

AVANGARDCHIK vs RAJA MANAGEMENT                    06/29/2020
ERIN FUCHS

```
                                        Page 73

  1                C E R T I F I C A T E
  2
  3     THE STATE OF FLORIDA
  4     COUNTY OF PALM BEACH
  5           I, MARY ANN HENGSTLER, Registered
  6     Professional Reporter, do hereby certify that I was
  7     authorized to and did stenographically report the
  8     foregoing deposition; and that the transcript is a true
  9     and correct transcription of the testimony given by the
 10     witness.
 11           I further certify that I am not a relative,
 12     employee, attorney or counsel of any of the parties,
 13     nor am I a relative or employee of any of the parties'
 14     attorney or counsel connected with the action, nor am I
 15     financially interested in the action.
 16           Dated this 13th day of July, 2020.
 17
 18
 19
 20
 21
 22     _____
           MARY ANN HENGSTLER, RPR-CP
 23
 24
 25
```

19 (Page 73)

Electronically signed by Mary Hengstler (501-151-220-3837)
Electronically signed by Mary Hengstler (501-151-220-3837)                                   3e45e38a-3358-4c0d-9e79-86ecb951376e

**A**

**a.m** 1:18 4:4
**ability** 11:19,22
 56:15,17,18
 63:4
**able** 11:24 12:1
 13:8 16:1
 18:25 34:6
 42:23 45:4
**above-entitled**
 4:7
**above-named**
 4:7
**AC** 1:8 41:4,17
 41:18,20 44:3
 44:9,22 46:9
 47:8,14,21,24
 48:2,3,7,11,20
 49:1,5,7,9,11
 49:12,16 51:9
 51:21,24 54:7
 55:8 56:23
 59:22 60:6,8
 61:11,11,14,17
 61:17 62:12,15
 62:18 63:20
**accept** 48:4,6
**account** 8:4
 24:24 25:11,24
 38:11 43:15
 45:12 46:8,12
 50:15 55:20
 56:12 57:7
 58:22 59:8,14
 60:16,24 61:9
 61:13 62:5,14
 64:19 66:5,18
 66:19,24 67:6
 67:14 70:5,12
 70:15
**accountable**
 9:10
**accounting** 8:5
 71:6,9
**accounts** 58:9

58:13,18 59:2
 59:5
**accuracy** 23:5
 23:12 28:13
**accurate** 27:8,16
 27:20 30:2,8
 57:16
**act** 24:9 25:1,7
 25:13,25 29:12
**action** 1:2 31:7
 38:5 54:20
 57:4 73:14,15
**actions** 31:4,10
 32:6
**acts** 25:18,19
**added** 19:8
**address** 19:24
**adheres** 20:23
**admitted** 61:12
**advise** 56:22
**agencies** 21:22
 22:1,6 27:21
 28:1,14
**agency** 24:25
 25:12,24 29:24
**ago** 34:1
**agree** 21:12,15
 21:16 26:18
 27:7,14,19,23
 28:20 29:20
 30:1,7,11,14
 30:19 36:16
 38:19,20 40:5
 40:24 41:2,14
 41:24 42:5
 47:7 52:14
 53:21 54:3,7
 54:15 56:15
 57:25 60:1,11
 60:14,23 61:6
 61:7,14 62:12
 62:22,25 65:7
 65:12,21 66:4
 66:17,21,22
 69:2,15 70:11

70:14,20,22
 71:5
**agreeing** 38:12
**ahead** 12:22
 24:15 42:1
**allowed** 37:25
 53:23
**allows** 59:2
**amended** 14:3,5
**amount** 44:11
 44:17
**Ann** 1:24 4:2
 72:20 73:5,22
**answer** 5:7,9
 23:23 24:1,11
 24:12,14,15
 25:3 26:5,13
 26:23 28:3
 29:2,9 34:23
 67:18 69:10
**answered** 17:13
 62:9
**answers** 5:2,4
**anxiety** 68:7,12
 68:14
**anybody** 4:18
 10:13 69:14
**anymore** 39:6
**apologize** 43:3
 63:7
**APPEARAN...**
 2:1
**appeared** 64:20
 70:6 72:7
**appearing** 66:5
 67:5
**appears** 56:10
**application**
 11:11 41:20,25
 42:2
**applications**
 48:4,7
**applies** 33:9
**apply** 15:2,4,8
 16:20 23:14

**April** 55:16 56:8
 56:11,16 60:2
**aside** 11:3
**Asked** 62:9
**asking** 42:14
**assume** 5:10
**assuming** 10:21
 14:19 65:17
**assumption**
 65:25
**assumptions**
 65:2
**attic** 51:20
**attorney** 10:11
 73:12,14
**audible** 5:1
**authority** 43:2,8
 43:11,14,17
 72:6
**authorized** 73:7
**available** 17:8
**avoided** 32:7
**aware** 42:19
 44:3 59:21
 69:7

**B**

**back** 10:17
 15:25 31:12
 33:15 37:11
 38:20 43:1
 50:22 51:1
 60:22
**bad** 28:19 63:6
**basic** 9:16
**Bates** 13:13,20
 19:4 45:9
 46:22 47:23
 50:12,12 55:24
**Beach** 2:3 72:4
 73:4
**becoming** 57:9
 68:4
**beginning** 4:4
**behavior** 71:1

**behaviors** 71:3,7
 71:10
**believe** 8:2 11:4
 12:5 17:13
 42:10 45:24
 51:5 55:23
 56:24 57:14,15
**believed** 62:18
**benefit** 59:13,15
 59:18
**best** 8:23 20:11
 63:4
**better** 16:6
 18:12,19 31:23
 33:17
**binding** 23:18
 23:25 24:4
**bit** 7:19 8:9 9:5
 20:13 31:20
 42:8 49:13
 66:9 67:1
**borrower** 71:4,7
 71:11
**borrowers** 71:2
 71:2
**bottom** 45:16
**Bouevard** 2:6
**breached** 53:9
**break** 5:5 43:20
**broke** 6:4 21:3
**budget** 9:25
**bunch** 11:5
**business** 48:8,11
 48:13

**C**

**C** 73:1,1
**call** 8:17 31:21
 31:24 47:21
 51:9,13,17,24
 55:4
**called** 11:16
 12:7 33:20
**calls** 11:6 44:21
 44:24 52:5,12

AVANGARDCHIK vs RAJA MANAGEMENT                    06/29/2020
ERIN FUCHS

Page 75

53:24 61:1,2
**cancel** 37:14,19
  37:21 43:17
  50:3,5
**cancelled** 37:15
  37:18
**cancelling** 47:10
**CAPITAL** 1:8,9
**case** 4:17 41:12
  57:6
**cause** 4:7 65:8
**caused** 67:5
**causing** 68:1,17
**certain** 30:21
  59:3
**certificate** 11:10
  52:9 72:1
**certified** 4:13
**certify** 72:7 73:6
  73:11
**change** 69:10
**changed** 10:2
**changing** 21:3
**characterizati...**
  26:13 64:14
**check** 11:10
  28:10,10,12
  29:23
**choice** 60:24
**choose** 48:10,12
**chosen** 48:8
**CIVIL** 1:2
**clarifying** 46:7
**Clayton** 2:7
**clear** 42:16
  60:13
**coach** 6:23 7:2
  8:10,22,24 9:6
  12:6
**coaching** 8:14
  8:19 9:3,4
  31:18,19,22
  32:9
**collaboration**
  7:10

**collaborative**
  19:18 31:24
**collect** 24:8 25:6
  26:10 35:22
  36:17 38:1
**collection** 8:13
  8:15 43:8
  57:22 58:1,5,9
  59:11,18 65:1
  65:8,14,23
  69:17,23
**collections** 8:4
  14:25,25 15:7
  15:13 16:10,16
  17:5 33:9
**come** 51:20
**comfortable**
  67:17,21
**comments** 31:23
**Commission**
  72:22
**committed**
  37:16
**communicate**
  35:23 37:11
**communication**
  4:22 37:9,17
  57:2
**company** 26:8
  27:7,14,19,23
  28:11,21 29:17
  29:21 30:14,19
  31:16 48:3
**company's**
  27:15 30:3
**complained**
  33:20
**complaining**
  34:14
**complaint** 3:10
  11:14 16:5,13
  17:19 18:7,10
  18:14 19:9,11
  19:17,23 20:2
  20:3,22 21:5

34:9,18,22
  35:2,8,15
  59:22
**complaints**
  11:20 19:24
  20:20 30:16
  35:3 42:19,24
**complete** 30:2
  48:18,19 49:8
  49:14 50:1
  55:7 62:21
**completed** 35:10
  39:20,23 41:4
  41:15 42:10
  48:24 49:2,17
  49:21 52:16,18
  54:5,9,17 55:3
  55:6,11 58:2
  61:20,23 62:2
  63:1
**compliance** 12:7
  13:1,19 16:20
  17:15 18:5
  20:7 21:6
  32:12 35:1
**computer** 12:21
  12:24 13:6
  15:18 17:22
  23:2
**concerning** 50:9
**concluded** 71:21
**conclusion** 25:2
  29:8 30:4
  53:25 67:16
  68:9 69:18
**condition** 60:15
**conduct** 31:21
**confirmation**
  39:19
**confirms** 40:19
**confused** 39:7
**connected** 73:14
**connecting** 7:12
  52:3
**connects** 9:9

**consider** 24:8
**consistency**
  20:16
**consistently** 9:9
  31:16
**constructive**
  32:1
**consumer** 2:2
  16:5,13 17:19
  18:7,9,13
  21:13 26:9
  28:16,16 34:9
  34:18 35:2,8,8
  40:9
**consumer's**
  40:10
**consumers**
  21:17 22:1
  27:8
**contemplates**
  61:20
**continue** 48:10
  57:6 58:8
**continued** 57:25
  62:4
**continuing** 52:3
**contract** 11:9
  20:25 23:18,25
  24:4 30:20
  37:15,15,19,19
  37:22 38:6,9
  38:10,12,25
  39:11,15,15,18
  39:19,23 40:3
  41:2 42:2
  43:18 50:3,5
  52:15,18,23,24
  53:4,8,13,15
  53:22,23 61:17
  61:19 62:20
**contractor**
  19:17,23 20:21
  34:14 35:3,9
  36:16 37:7,14
  38:14,17 39:12

39:25 40:6
  42:7 44:14
  49:25 52:25
  57:19
**contractor's**
  40:9 43:15
**contractors**
  19:25 27:15
  30:7 42:20
**contracts** 38:19
  38:20
**control** 62:12
**conversation**
  39:20 50:22
  51:2
**conversations**
  50:25
**copied** 46:3
**copy** 11:11
**corporate** 10:22
  36:8,9,12
**correct** 5:16,17
  8:2 10:23 13:9
  14:1 16:7
  17:22 21:14
  23:11,16 30:3
  31:2 34:19,20
  36:5,11,18
  38:22 41:12
  45:12,13,22
  47:14,25 48:1
  48:21,24 49:3
  49:6,23 50:6,7
  52:16 53:19
  54:9 55:16,21
  56:19 59:16
  60:3,4 61:15
  62:5,23,24
  68:2 71:11
  73:9
**counsel** 2:3,7
  11:1 24:13
  73:12,14
**COUNTY** 72:4
  73:4

AVANGARDCHIK vs RAJA MANAGEMENT          06/29/2020
ERIN FUCHS

Page 76

course 38:5
    54:20 57:4
court 1:1 4:8 5:1
    5:4 24:18 27:1
covered 32:8
create 7:23 9:2
    12:14 13:25
    32:6
created 12:17,20
    13:5,9 23:4,10
    38:11 45:15,21
    45:24 46:2,23
    46:25
creates 52:25
creating 68:22
credit 11:12
    21:22,25 22:5
    22:20,24 23:5
    23:8,12,15
    24:25 25:12,24
    27:20,25 28:14
    28:22 29:6,13
    29:14,24 41:25
    42:2 43:11,12
    55:19,20 56:4
    56:12 57:7
    58:13,19 59:8
    59:14 60:2,10
    60:16,17,25
    61:10,15 62:5
    62:14,17 64:20
    66:6,12,19
    67:5,8,15 68:2
    68:8,18 69:1
    70:6,12,14,23
    70:25
Cristina 45:21
    45:25 46:2,3,4
    46:8,11
culture 31:14,15
current 19:11
    20:5 49:22
customer 3:10
    5:25 6:6 8:3
    9:6,10 11:13

11:20 16:19,23
    17:3 18:20
    19:8,10,24
    21:7,8,10
    26:17,18,19
    30:1,16 31:6
    33:20 34:14
    35:3,14,15,19
    35:23,25 36:18
    38:1 39:25
    42:19,23 46:20
    47:9 52:14
    53:1,4,8,11,14
    53:17,18,22
    55:5,11 57:23
customer's 11:9
    29:6,13 40:6
    40:19 43:12
    58:13,19
customers 8:18
    8:21 20:12,15
    20:16 21:14
    30:9 33:5,14
customers' 12:2
    53:12
cut 67:1

            D
d/b/a 1:8
Darren 2:5 4:16
    13:12
darren@cloor...
    2:4
date 45:18
Dated 73:16
dates 18:12
day 72:10 73:16
days 57:16
dealing 21:14
debt 24:8 25:6
    26:10 36:17
    38:1 43:8
    61:15,16 64:25
    65:7,14,23
    69:17,22,23

70:23
December 72:23
deceptive 25:7
    25:13,18,20,21
    25:25 29:12
    35:11 48:14
decides 38:10
Defendant 2:7
Defendants 1:10
define 7:24
    68:12,14
defined 35:7,11
    36:6 57:11,12
defining 18:13
definitively 37:6
delete 56:12,16
deleted 55:18,19
    56:3 60:2
deliver 8:21
    20:11
department
    6:21 7:1,21,25
    9:1,3,4,7,8,11
    14:20,25 15:6
    15:7,13 16:16
    16:19,24 17:4
    17:6 19:20
departments
    6:22,24 7:11
    7:12 8:1,6
    30:25
deposed 10:4
deposition 1:14
    4:1,19,23 10:9
    10:22 73:8
describe 7:18
    9:20 18:9
    40:11 50:13
    52:19
described 8:7
describing 9:15
    32:2,11 35:14
    38:24 42:9
design 6:23 7:2
    7:17 9:2 36:12

designated
    18:14
designed 21:6
details 35:22
    42:22
determine 39:11
develop 28:18
different 15:22
    25:16 32:11
    44:17
differently
    39:24 69:3
difficult 5:3
    69:13
diligence 36:25
    37:3
direct 3:4 4:14
    60:7
direction 11:1
disagree 52:4
disagreed 52:2
disciplinarian...
    31:16
disciplinary
    31:4,7,10,12
    32:3
disclosures
    26:10 27:9,17
    30:2,9
discord 32:6
discovery 19:13
discussed 55:4
disease 69:8,12
dispute 40:21
    44:3 48:16
    56:22 58:22
    63:5,9,11,15
    63:19
DISTRICT 1:1
    1:1
DIVISION 1:2
docs 11:8
document 12:7
    13:14,25 14:8
    17:16,20 18:2

19:1 20:23
    23:4 34:25
    35:12 36:22
    50:13 55:11
    57:15
documents
    10:15,17,20,24
    11:5 13:22
    14:9,11 15:22
    17:7 18:3
    22:11,13,22,25
    42:11
doing 9:3 48:8
due 36:25 37:2
    68:1
duly 4:12 72:8

            E
E 73:1,1
e-mail 12:22
E-signature
    62:22
earlier 54:11
easier 13:3
echo 30:13
educate 21:6
educated 21:1
EF 56:4,6
effectively 15:24
    17:9
efficiently 6:25
either 35:1
elaborate 7:18
    7:19 8:9 9:5
    20:13 31:20
elderly 69:7,11
electronic 52:7
Elora 45:25 46:3
    46:19 50:8
    51:5,12 52:5
    53:18 56:22
Elora's 46:14
    47:12 54:22
emotional 65:22
    66:2,5

AVANGARDCHIK vs RAJA MANAGEMENT                                    06/29/2020
ERIN FUCHS

Page 77

employed 5:16
  6:9 23:6,11
employee 12:7
  13:1,2,5,19
  14:15 15:8
  16:14,20 17:14
  18:5 20:6,25
  32:11,13 33:17
  34:21 35:1
  73:12,13
employees 6:24
  7:2,9 8:10,13
  8:15,24 9:6
  12:6 21:9,12
  23:17,24 24:4
  24:6 31:1,5,5,6
  31:11,13,17,22
  32:20 33:10,11
  33:12 52:17
  63:14,18
employer 6:11
encompass 32:3
  34:22
encourage 57:1
enforce 30:20
engaged 31:25
ensure 8:17
  20:17 40:8
ensures 20:23
entire 60:12
environment
  19:19
Erin 1:14 3:3
  4:1,11 5:15
  26:5 71:18
  72:7
ESQUIRE 2:5,8
event 9:11
eventually 55:15
  55:18
evolution 19:10
evolved 9:16
exactly 11:15
  15:15
exaggeration

66:9,10
Examination
  3:4 4:14
examples 32:19
  32:22
excellent 8:16
  8:18
exception 49:16
  49:18
excuse 7:19
  10:12 11:24
  25:19 28:9
  45:24 49:15
  50:2,12 55:19
  62:1 66:18
  67:8
Exhibit 3:9
  13:18,23 16:4
  19:4,6 20:4
  34:2,6 45:8
EXHIBITS 3:8
exist 22:17
existed 23:3
expelled 47:24
  48:2,4
expenses 9:23
experience 16:6
  18:20 20:12,16
  66:4,10 69:2
  69:14
Expires 72:23
explain 36:21
  37:2 52:21,23
explains 20:24
extent 10:25
  26:21 29:8
extreme 69:1

———————
        F
———————
F 73:1
fact 62:1
facts 39:4
fair 19:22
falsify 40:6
falsifying 40:9

familiar 13:22
  40:21
Fast 1:8 41:4,17
  41:18,20 44:3
  44:9,22 46:9
  47:8,14,21,24
  48:2,3,7,11,20
  49:1,5,7,9,11
  49:12,15,16
  50:2 51:9,13
  51:21,24 54:7
  55:8 56:23
  59:22 60:6,8
  61:11,11,14,17
  61:17 62:12,15
  62:18 63:20
February 59:22
  60:1
federal 20:24
  21:7,13
fee 44:13,16
feedback 8:15
  31:17 32:1
feel 67:17,21
Feet 6:12,14,16
figure 37:13
figuring 37:16
filed 4:5 59:21
  60:1
files 12:2
filing 60:5,8
finally 60:9
Finance 1:9
  37:11 67:25
financially
  73:15
financing 26:8,9
  27:7,9,14,15
  27:16,19,23
  28:11,21 29:17
  29:21 30:3,3,9
  30:11,14,19
  38:13,16,21
  44:14 47:17
  49:3,8,17,19

49:20
find 8:20
finished 55:13
firearms 33:2
first 4:12 10:6
  45:14
five 43:20
flag 58:21,25
  59:2
flagging 59:5
Fleet 6:12,14,16
Florida 1:1,25
  2:3 4:4 72:3,21
  73:3
flows 59:4
follow 21:13
  31:1 38:4
  39:10,14,18
follow-up 18:16
followed 31:8
  63:22
following 18:15
follows 4:13
  32:4
followup 18:12
Force 11:17,19
  12:3 42:24
  45:11 47:3,5,6
  59:2
foregoing 73:8
forget 26:24
  43:3
form 23:19
formed 53:5
Forsyth 2:6
Friday 10:10
front 16:2 17:21
  19:1 33:15
  34:3 45:5,14
  46:22 47:24
  50:21
FT 1:2
FTL 1:8,8 5:16
  5:18,21 6:9
  7:14 8:1 11:16

20:8,23 21:20
  21:25 22:3,3,8
  22:19,23 23:6
  23:11,17,24
  24:3 31:5,7,12
  32:4,5 33:19
  34:12 36:2,9
  36:17,24 37:6
  37:11,12,13,18
  37:19,24 38:13
  38:16,21 39:10
  39:14,17 40:1
  40:22 41:4,16
  41:23,24 44:4
  44:7,9,10,13
  44:22 46:12,15
  47:17,20 48:6
  48:10,12,14,23
  49:2,5,7,10,15
  50:2,12 51:13
  51:16 52:14,17
  53:3,7,11,14
  54:3,8,15 55:8
  55:15,18 56:11
  57:6,12,19,25
  58:4,12,15,17
  58:21 59:2,7
  59:11,13,18,22
  60:6,24 61:9
  62:1,4,8,13,18
  62:25 63:5,9
  63:15,25 64:4
  64:12,18,24
  65:1,12,21
  66:24 67:4,12
  67:14,25 68:6
  69:15 70:15,20
  71:1,6
FTL's 8:24
  11:13,13 12:6
  12:10 19:13
  21:9,12,16
  31:14 37:16
  45:11 49:22
  58:8 63:14,18

AVANGARDCHIK vs RAJA MANAGEMENT                    06/29/2020
ERIN FUCHS

Page 78

63:22 65:14
68:16,21 70:22
70:25
**FTL0** 47:23
**FTL00029**
13:20
**FTL066** 19:5
34:3
**FTL068** 45:9
**FTL069** 46:23
54:23
**FTL070** 47:24
**FTL075** 50:13
55:25 56:21
**FTLs** 24:6
**Fuchs** 1:14 3:3
4:1,11,16 5:15
13:23 16:2
44:2 45:4
50:13 54:23
56:6 60:23
71:15 72:7
**fully** 30:16 54:5
55:3 58:2
61:20,23 62:2
**fund** 52:25
**funding** 49:9,11
**funds** 43:14
49:23 50:1
55:8,15 57:19
**further** 36:6,25
73:11

_____
                    **G**
**GARY** 1:5
**gather** 10:24
15:15 37:4
**generally** 47:3
**GG909645**
72:22
**give** 5:1 7:8
27:16 31:16
**given** 60:14 73:9
**giving** 8:15
49:15

**go** 4:25 11:2
12:21,22 18:22
24:15 42:1
46:21 49:14
60:19,22 68:20
**going** 4:18,25
5:9 12:25
15:25 40:22
43:1 46:21
49:13 55:6
57:23 58:5
**good** 14:13
24:16 28:16
71:17
**Gosh** 11:11
**gotten** 52:4
**GPM** 2:6
**ground** 4:25
**grow** 31:17
**growth** 31:25
**Grzybinski** 2:10
4:20 22:9
58:16
**guess** 16:5 32:16
39:9 42:24
**guidance** 18:11
**guides** 15:23
17:8

_____
                    **H**
**half** 6:8 38:17
49:8
**halfway** 48:24
49:2
**hand** 45:16
72:10
**handbook** 32:5
32:9,10,13,15
32:19,23,25
33:1,4,7,9,15
**handful** 19:19
**handle** 30:15
63:4,8,8,10,11
63:15,16
**handled** 63:6

**handling** 63:19
**hands** 18:4
**happen** 35:24
38:10 42:6
**happened** 37:17
37:22,25 41:11
47:5
**happens** 39:20
40:1
**hard** 67:18
**harm** 64:1,5,13
64:18,25 65:3
65:5,22,25
66:2,2,5,22
67:4,13,18
**harmed** 21:18
26:20
**head** 15:14,16
16:18 32:25
44:20
**hear** 31:22
**hearing** 52:11
**held** 21:7
**help** 6:23 7:2,17
7:24 8:10,15
8:24 9:1,6
10:15,24 12:5
12:14 15:23
21:17 22:22
26:19 27:5
36:12 50:25
**helped** 13:25
**helpful** 51:23
**helping** 10:21
**helps** 50:22
54:12
**Hengstler** 1:24
4:2 72:6,20
73:5,22
**hereinunder**
4:13
**highlighted**
50:17 55:25
56:21
**Highway** 2:2

**hold** 13:16 15:25
34:4 44:1
50:16 52:8
55:24
**holds** 9:10
**home** 40:25
47:14 54:4
**hour** 4:4
**house** 51:20
**HR** 32:16
**hundred** 17:14

_____
                    **I**
**ID** 11:10
**idea** 28:19 50:10
**IDENTIFICA...**
3:8
**identified** 20:2
45:8
**identify** 7:22
11:24 17:2
42:23
**identity** 40:12
40:13,18 41:3
41:10,15 42:6
42:11
**immediately**
49:14
**important** 20:8
20:10 26:16
27:11
**improve** 18:19
**improving**
31:25
**inaccurate**
22:20,24 23:8
23:15 28:22
29:6,13,18,21
66:12,19,24
67:5,14 68:2,7
68:17 69:1,23
70:5,11,15
71:5,9
**included** 16:10
**incorrect** 29:17

**INDEX** 3:1
**indicated** 19:14
**indicates** 52:17
**individual** 17:6
69:11
**inefficiencies**
7:22
**influence** 70:23
**inform** 24:4
**information** 7:9
8:21 21:21,25
22:5 27:20,25
28:13 29:6,13
29:23 37:4
**informed** 21:8
**initiates** 52:25
**initiatives** 9:24
**inside** 8:4
**instance** 1:14
4:6 48:14,15
**interactions**
33:4
**interdepartm...**
15:5
**interested** 73:15
**interpret** 28:7
**interrupt** 12:23
54:25 70:2
**invoice** 44:8
**invoiced** 44:11
**invoices** 47:20
**involve** 33:4
**involved** 9:18,21
9:22 19:16
**involvement**
8:14
**involves** 39:16
**involving** 19:24
34:13 36:15
**issue** 58:10
**issued** 44:7
**it'd** 29:5

_____
                    **J**
**job** 5:18 6:16,19

7:4,9 8:23 9:14
15:23 17:9
43:2,4 47:10
**July** 72:11 73:16
**June** 1:18 4:5

---
**K**
---
**keep** 44:13 48:8
**keyword** 11:22
**keywords** 12:1
**kind** 6:16,23
7:10 8:17,22
9:1 21:3 26:24
42:13 68:15
**kinds** 14:11,22
**knew** 29:17
37:22 54:3,15
58:1 62:1,25
**know** 5:6 7:14
7:24 8:16,20
9:25 10:25
11:1,19 12:17
13:8 14:3
15:14,15,20
16:17,22 17:10
18:15,19,21,24
19:16,19 22:7
22:8,8,9,13,16
22:18,21,22,25
23:9,17,25,25
24:1,5 25:15
26:22 28:15
29:21 31:9
32:7,15,24
33:3 34:3,25
35:1 37:1,6,24
39:24 41:8
42:16,22 44:10
44:19 46:14
47:2,4,5,20,22
49:25 51:16,18
51:21,22 52:3
52:15 54:1,6
55:1,13,22
56:14 58:4,14

58:15,15,20,21
58:24 59:9,12
59:20,24 60:7
60:18 62:10
63:21 64:2,3,4
64:8 65:4,18
66:1 68:11
69:9 71:19
**knowing** 69:10
**known** 49:20
**knows** 30:20
**Kyla** 46:25

---
**L**
---
**label** 50:12
55:25
**labeled** 13:20
19:4 45:9
46:23 47:23,23
**lack** 16:5
**Large** 4:4
**LATHROP** 2:6
**LAW** 2:2
**laws** 21:13
**lawsuit** 60:6,8
**leader** 9:2,4,9,11
**leaders** 6:22 7:1
7:21 9:3 19:20
**leads** 19:21
**learn** 34:5
**leasing** 8:20
50:16
**leave** 36:22
**left** 39:21 45:16
49:13
**legal** 25:2 26:12
29:8 30:4 53:3
53:7,24 67:16
68:9 69:18
**lend** 38:5
**lenders** 71:3
**lending** 20:24
**let's** 5:2 18:25
31:12 45:3
49:25 50:11

**letters** 43:8
57:23 58:1,5,9
59:11,19 65:1
65:8,14,23
69:17,23
**LexisNexis**
11:10
**lied** 35:10
**life** 69:14
**line** 9:23
**list** 50:15
**listened** 44:24
45:1
**little** 7:19 8:9
9:5 20:13
31:20 39:7
42:8 67:1
**LLC** 1:8,8
**LLP** 2:6
**loan** 26:17,19
27:9,13 42:2
44:7 50:16
52:25 55:11
**long** 6:1,6 34:1
45:1 57:10,12
**longer** 48:4,6
**look** 10:15 12:24
18:22 45:16
51:20 54:12
55:25
**looked** 22:11
**looking** 17:17
18:1,2,4 50:12
50:14
**looks** 45:25
**lose** 69:22 70:2,4
70:5,9
**loss** 69:16
**lot** 7:11
**lots** 16:25
**loud** 50:19
**lowered** 70:15
**lowers** 70:12
**lying** 36:16 60:9

---
**M**
---
**ma'am** 63:12
**Madam** 24:18
**making** 8:22
9:23
**management**
16:5,14 17:19
18:10 34:9,18
**manager** 5:19
5:21,24,25 6:2
6:7,18,19 7:6
8:4 9:18 35:20
35:23,25 43:5
43:6,7 46:8,12
**managers** 19:21
**managing** 9:25
**manual** 32:12
**marked** 13:17
**marketing** 7:16
**Mary** 1:24 4:2
72:6,20 73:5
73:22
**material** 14:17
14:20,22 16:25
26:9
**Matt** 47:8,8
48:20,23 49:1
49:4,4,5,7,7
54:7 55:10,12
**mean** 12:23
20:19 21:23
22:3 28:2,5
32:24 36:2,9
36:21,24 37:2
38:10,11 39:14
39:17 48:2
52:7 53:22
54:25 55:2
58:25 67:22
70:2
**meaning** 47:8
**means** 48:4
**meant** 49:5
**message** 46:3
**met** 10:10

**MIDDLE** 1:1
**midst** 58:6
**mind** 24:19 27:2
**minimum** 28:10
**minute** 43:20
64:8
**Missouri** 2:7
**misspoke** 25:23
**mistakes** 63:19
**Mm-hmm** 7:3
12:4,9
**moment** 13:16
15:25 43:1
44:1 45:3
55:24
**monitoring** 8:17
**Morning** 4:16
**move** 5:10 34:25
**MYERS** 1:2

---
**N**
---
**name** 4:16 5:13
48:3
**narrow** 8:12
**necessarily**
32:14 38:25
51:25
**need** 5:5 7:9
8:21 9:12
10:18 18:16
20:18 55:5
57:4 64:3,4,6
**needed** 55:14
**needlessly** 21:18
26:20
**needs** 55:5
**negative** 24:24
25:11,23 55:18
55:20 56:12
57:7 58:9,13
58:18 59:7,13
60:24 61:9
62:4,13,17
64:19 66:5,18
66:19,23 67:14

AVANGARDCHIK vs RAJA MANAGEMENT                    06/29/2020
ERIN FUCHS

Page 80

70:11
**neurosis** 68:15
**never** 30:16
  47:14
**newest** 19:11
**Newhart** 2:5 3:4
  4:15,17 6:15
  11:7 13:15,21
  19:3,7 23:21
  24:2,13,18,23
  25:5,10,17
  26:7,15 27:1,6
  28:6,25 29:4
  29:11,19 30:6
  36:11,14 37:23
  38:7 39:8
  40:20 43:23
  53:2 54:2 59:1
  60:19,21 61:5
  62:11 64:16,23
  65:6,11,20
  66:3,11,16
  67:8,11,20
  68:13,23 69:21
  70:1,10,19
  71:12,14
**Nope** 40:15
**normal** 24:6
  38:5 47:17
  49:16
**North** 2:3
**Notary** 1:25 4:3
  72:21
**note** 45:14,21
  46:2,22,25
  47:2,6,8,11,12
  50:15 51:3,15
  54:21,22
**notes** 45:10
  54:10
**Notice** 4:5
**November**
  44:22 45:15,19
  46:23 47:21
  50:8,23,23

51:6,9 54:4,8
54:16 58:12
63:1
**number** 13:13

——————
**O**
**OATH** 72:1
**object** 23:19
  24:10,14 25:2
  26:12,21 28:2
  28:24 29:7,8
  30:4 37:20
  39:3 58:23
  61:1 65:2
**objected** 26:4
**objecting** 23:22
  29:1 36:8
**objection** 25:8
  25:14 26:2
  29:15 38:2
  53:24 62:9
  64:14,21 65:9
  65:15,17,24
  66:7,13 67:7
  67:16 68:9,19
  69:18,24 70:7
  70:17 71:8
**October** 44:8
**offered** 51:8,19
**official** 72:10
**Oh** 17:17,21,21
  18:3 30:12
  54:25
**okay** 4:21,23,24
  5:11,12 6:1,6
  6:11 8:9,14 9:5
  10:2 12:24
  13:4,11,25
  14:19 15:7
  16:19 17:13,21
  18:5,9 19:13
  19:15 20:6
  21:16 23:6
  25:21 26:8
  28:11 29:5

30:1 31:4
32:10 33:12,16
34:9,16 35:6,7
35:7,13 37:18
39:9 40:1
41:10,14,22
42:4,13,18
43:20 45:3,14
45:21 46:5,14
46:21 47:7,7
47:16 48:6
50:17,21,24
51:4,8,12,16
53:21 54:14,15
54:19 55:2
56:25 57:5
59:6,25 61:8
62:25 67:24
68:24 69:10,15
71:20
**once** 35:15
  36:19 61:13
**one-on-one**
  31:18,19 32:8
**operational** 9:23
**operations** 5:19
  5:20,24 6:2,19
  7:5 9:17 32:18
  43:5,6,7
**orchestrate** 7:10
**order** 29:20 37:1
  71:18
**ORGANIZAT...**
  2:2
**original** 34:11
**outlined** 38:25
  39:10,15,18
**outlines** 32:5
**outlining** 32:16
**outside** 47:6
**oversee** 8:6

——————
**P**
**P.A** 2:2
**p.m** 1:18 71:21

**PAGE** 3:2,8
**paid** 44:9,10
**Palm** 2:3 72:4
  73:4
**panic** 68:15,17
  68:22 69:5
**paraphrasing**
  56:24
**Parkinson's**
  69:8,12
**part** 14:17 21:4
  56:24
**partially** 49:21
**parties** 37:5,9
  57:3 73:12
**parties'** 73:13
**partners** 1:8
  48:13
**passed** 11:10
**pastes** 46:3
**PATRICIA** 2:8
**Patty** 10:10,18
**pay** 70:23
**payment** 71:1,3
  71:7,10
**pending** 4:7 5:7
  58:22
**people** 18:14
  69:2
**percent** 17:14
**Perez** 45:22 46:1
  46:8,11
**performed** 24:9
  24:25 25:7,12
  25:25 30:17,21
  31:23 33:21
  36:16 37:7,14
  38:14,17,22
  39:1,12 40:2,4
  40:7,25 41:15
  41:20 42:7
  47:18 51:21
  52:9 57:20
**performing**
  19:25 34:14

35:4 42:20
**person** 9:9
**perspective** 9:12
  32:17,17,18
**pertains** 32:14
**phone** 44:21,24
  47:21 52:5,12
  55:4
**phrase** 16:6
  26:22 28:8,8
**place** 12:12
  14:15 15:10,13
  15:16 16:23
  17:1,8 23:7
  27:24 28:12,15
  28:22 30:15
  33:7,19 34:13
  37:10,11 38:9
  39:1 40:8
  42:12 44:21
  55:22,23 56:8
  63:23 71:18
**placed** 47:3
**placing** 70:21
**plaintiff** 1:6,14
  2:3 4:6,17
**Plaintiff's** 3:9
  13:18,23 16:4
  19:3,6 20:4
  34:2,6 45:7
**please** 5:1,7,13
  17:3 20:14
  24:19 40:11
  42:15 50:18
  52:20 56:1
**point** 14:13
  49:10 55:2,9
  57:11 60:8
**policies** 8:24
  12:6,10,14
  13:2,5 14:14
  14:16,24 15:1
  15:4,8,12 16:1
  16:6,10,14,15
  16:20,22 17:1

17:2,7,18
18:18 19:9
20:7 21:16,20
22:4,16,19,23
23:7 24:3
27:24 28:12,21
30:15,23 31:1
31:8,13 34:12
36:12 63:23
**policy** 17:20
22:10 32:12,14
49:22 58:8,17
**pop** 12:2
**portion** 50:18
**position** 5:23
46:14,18
**positive** 32:1
**possible** 20:12
20:12 56:23
**potential** 71:4
**practice** 49:16
**practices** 17:7
**premises** 33:2
**prepare** 10:8,16
10:21 15:17
**PRESENT** 2:10
**presented** 54:20
**presenting**
17:23 47:4
**president** 7:14
7:15
**pretty** 32:3,9
**prevent** 21:17
22:20,24 23:14
26:19 28:22
43:11 59:7,11
60:16
**previous** 5:23
**previously** 7:17
30:24 41:11
47:16
**prior** 6:9,11
56:16
**Probably** 51:7
70:18

**procedure** 22:10
32:15 58:17
**procedures** 8:25
12:6,10,15
14:15,25 15:1
15:4,12 16:1,6
16:11,14,15,23
17:3,18 20:8
21:17,21 22:4
22:16,20,23
23:7 24:3
27:24 28:12,21
30:15,23 31:1
31:8 32:4
33:19,23 34:13
36:13 63:23
**Proceedings**
71:21
**process** 3:10
11:14 18:14
19:11,17,23
20:2,4,5,11,22
21:5 32:17
35:2 52:24
55:14 57:9,10
57:12,18,22
**processed** 41:8
60:10
**processes** 6:23
7:2,12,18,22
9:2 11:13
**product** 30:3
**products** 27:16
**Professional** 4:3
73:6
**program** 12:8
13:1,19 17:15
18:6 20:7 21:6
34:22 35:2
**promote** 37:9
57:2
**protection** 21:13
28:16,17
**provide** 8:16,19
10:20 30:8

31:22 38:13,16
47:17 53:3,7
**provided** 10:17
11:6 49:2,19
49:20
**provides** 38:21
**providing** 8:18
49:17
**Public** 1:25 4:3
72:21
**pull** 13:16 15:25
43:14 49:10
50:1 55:8
57:19
**pulled** 17:20
49:23 55:15
**purpose** 18:17
70:20,22,25
**pursuant** 4:5
**put** 18:11

---

**Q**

**question** 5:7,7,8
5:10 21:24
23:22 24:10,17
24:19 25:15,16
26:4,25 27:2
31:10 34:11
41:7,19 42:15
58:23 63:7,7
64:11,15
**questions** 9:12
25:22 39:5
42:14 71:13
**quick** 60:19
**quote** 32:3

---

**R**

**R** 2:5 73:1
**rate** 41:24
**read** 24:20 27:3
50:19,20
**reading** 54:24
**ready** 43:24
**real** 60:19

**really** 7:24 39:4
**reason** 27:12
62:18
**recall** 44:2,6,21
51:8,11,12,14
51:19 52:5,10
52:11
**receive** 30:2
35:15
**received** 26:9
27:8 47:20
69:22
**receiving** 65:7
65:14
**receptive** 31:24
**recognize** 35:9
**recollection**
12:20 54:13
**record** 5:14
13:17 19:4
24:21 27:4
43:21,22 45:7
50:11 60:20
**recorded** 11:5
**refer** 12:25
**reference** 34:2
34:17
**referring** 13:14
17:3 31:6
34:10 47:13
48:16,17 54:22
61:19
**refers** 35:3
**reflect** 64:6 71:6
71:10
**refresh** 12:20
54:13
**refund** 55:5,13
55:14
**Registered** 4:2
73:5
**regulations**
20:24 21:7
**reinforcement**
32:1

**relative** 73:11
73:13
**remains** 58:10
**remember**
11:15 16:17
17:6 32:22,24
33:15 44:23
46:10,11 50:22
50:25 51:2
52:13 54:10
55:17
**remind** 22:22,25
**remotely** 72:7
**remove** 60:24
61:9
**removed** 62:8
**rep** 36:8,10,12
**repeat** 5:8 6:13
21:2 24:17
26:25 40:16
52:22 64:11
65:16 67:1
**repeating** 24:19
27:2
**rephrase** 5:9
39:16 42:16
67:3
**report** 6:22 8:3
11:12 27:20
29:5,6,13,14
43:12 55:19,20
56:13,16 57:7
57:8 58:12,13
58:19 59:8,14
60:17,25 61:10
61:15 62:4,5
62:13,14 64:20
66:6,20 67:5,8
67:15 68:2,8
68:18 70:6
73:7
**reported** 1:24
21:21,25 22:5
29:23 58:18
62:17 66:19

67:14 70:16
71:6,10
**reporter** 4:3 5:1
5:4 6:13 24:18
24:20 27:1,3
40:16 52:22
61:2 65:16
71:19 73:6
**reporting** 21:22
22:1,6,20,24
23:5,8,12,15
24:24,25 25:11
25:12,23,24
27:21,25 28:13
28:14,22 29:24
43:12 56:3
58:9 59:7,13
60:2,10,16
61:15,16 62:17
66:12 68:2
69:1 70:23,25
**reports** 27:25
71:1
**represent** 4:17
12:19 59:25
**representative**
10:22 35:14
46:20 53:17,19
**representatives**
9:10 52:15
53:4,8,12,15
57:2
**requested** 24:21
27:4
**require** 57:22
**required** 49:22
58:12,18
**requires** 57:19
**reread** 57:14
**rescind** 53:12,15
53:23
**research** 10:19
**resolution** 39:22
**resolve** 36:1,3
37:8 39:11,25

**resolved** 20:17
20:19 36:19,21
38:3,4 57:3,5,9
58:7 61:13
**resolving** 37:16
**respect** 31:13
**Respectfully**
21:11
**respective** 30:25
**respond** 31:25
**response** 11:5,8
69:1,19
**responses** 5:1
19:13
**responsibilities**
6:20 7:5 9:14
9:17 43:2
**responsibility**
63:25 64:5,12
64:18,24 65:13
65:21 66:24
67:4,12,25
68:3,6
**responsible** 6:21
18:14 68:16,21
69:16
**rest** 20:22
**result** 38:11
60:5,7
**review** 10:12
45:10 50:17
**Reviewed** 50:24
**reviews** 31:21
**right** 10:23
11:17,18 12:12
13:2 14:21
17:16 19:2
20:1 22:1,2
24:16 30:9
31:14 34:10,16
36:7 39:2,12
40:7,22,23
42:7 43:24
45:15,16 46:9
47:10,18,19

48:22,25 49:14
51:6 53:15
54:17,18,23
55:7 56:9,16
57:13,20,21
59:3 60:22
61:21,24 62:2
62:14 63:2,3
71:7
**rights** 53:12
**room** 4:18
**RPR** 1:24
**RPR-CP** 4:3
73:22
**rules** 4:25
**run** 6:24 7:12

_____

**S**
**sales** 7:15 8:5
11:16,19 12:3
26:8 42:24
45:11 47:3,5,6
59:2
**salesperson** 6:18
**saw** 18:1
**saying** 41:8
47:13
**says** 36:2 47:8
47:11,12,24
56:3 57:19
**scenario** 39:5
42:9
**score** 70:12,15
**screen** 16:2 21:3
45:4,16
**screens** 34:5
**scroll** 35:5
**seal** 72:10
**search** 11:20,22
12:1
**second** 34:4
**section** 55:25
56:21
**see** 16:1 18:25
34:6 45:4

46:22 50:21
51:3,14 56:3
**selling** 27:15
**send** 41:24
57:25
**sending** 58:8
59:11,18
**sent** 41:4,16,23
43:9 45:25
47:2 49:9 65:1
**serious** 32:8
**service** 5:25 6:6
8:4,16,18 9:6
9:10 16:19,23
17:4 31:6
35:14,19,23,25
46:20 52:15
53:4,8,11,14
53:17,18
**session** 32:9
**set** 7:8 44:17
59:4
**seven** 6:22 8:2,3
8:6
**share** 34:5
**she'll** 24:13
**show** 34:17 35:5
**showed** 14:8
18:8 34:1,8
**showing** 11:10
21:4
**signature** 40:6
40:10,19 52:7
**signed** 42:11
52:6,8 55:11
62:20
**signing** 52:24
**signs** 53:22
**SILVA** 2:8
10:25 13:12
23:19,22 24:10
24:12 25:2,8
25:14 26:2,4
26:12,21 28:2
28:24 29:1,7

29:15 30:4
36:7 37:20
38:2 39:3
53:24 58:23
61:1,3 62:9
64:14,21 65:2
65:9,15,17,24
66:7,13 67:7
67:16 68:9,19
69:18,24 70:7
70:17 71:8,13
71:17,20
**situation** 33:20
34:13 35:13,16
35:22 36:1,3
36:15 37:1,5,8
49:23 51:5
57:3,5 58:6
68:12
**situation's** 38:4
**situations** 40:5
42:5
**sleep** 69:16,22
70:4,5,9
**smoothly** 7:13
**software** 8:20
11:16 45:11
50:16
**sorry** 6:4 12:22
15:3 18:1,23
20:25 21:2
23:21 26:3,25
28:25 29:7
30:13 31:9
34:4 35:18
40:16 42:1
43:21 52:22
54:24,25 61:3
64:7 67:10
70:3
**sort** 9:25
**sound** 57:16
**sounded** 30:11
**speak** 10:12
11:3 50:8 51:4

AVANGARDCHIK vs RAJA MANAGEMENT
ERIN FUCHS

06/29/2020

Page 83

speaking 10:11
  10:21 12:5
  25:18,19 30:12
  34:18,21 41:3
  48:20
specific 12:1
  14:20,24 20:1
  21:5 64:17
specifically
  19:24 20:2,21
  31:6 42:21
  48:15,17
speculation
  37:20 39:3
  61:3 65:9,24
  66:7 68:10
  69:24 70:7,17
  71:8
spoken 30:24
Sports 6:12,14
  6:17
state 1:25 4:3
  5:13 21:13
  72:3,21 73:3
STATES 1:1
stating 35:9
  62:20
stay 56:22
stenographica...
  1:24 73:7
steps 29:23 40:8
  40:11
stop 35:6,7 43:8
  57:23 58:4
stopped 60:9
store 6:18
story 47:9 52:3
strategies 9:24
stress 65:8,13
strict 31:15
strike 11:25
  24:6 63:7
  70:21
structure 7:23
struggling 31:10

stuff 15:15
  24:16 32:9,15
  33:3
submitted 11:12
sue 60:24
sued 61:11
suffered 64:1,13
  64:19,25 65:3
  65:5,13,18,22
  66:23 67:13
suffering 68:7
suggestions 7:23
suing 61:9 62:8
Suite 2:2,6
support 8:5 9:4
  9:11
supporting 6:21
  7:1
supposed 21:9
  24:11 35:15
  37:8 57:10
  62:7
sure 7:8,21 8:19
  8:22 9:22,23
  11:4 13:15
  17:5,14 18:11
  21:4 26:9 27:8
  28:4,10 31:21
  36:24 37:4,22
  37:24 39:4,19
  40:12 42:21
  50:19 64:10
SWFL 47:25
  48:2,3
sworn 4:12 72:8
systems 7:7,8

          T
T 73:1,1
take 5:2,4,5
  28:15 29:22
  31:5,7 43:20
  55:23 57:4,10
  57:13
taken 1:14 4:2

39:1 42:12
talk 5:2
talked 67:22
talking 11:8
  16:9 20:20
  34:7 35:16
  37:12 41:11
  49:24 57:18
  69:20
team 8:4 15:23
  17:8 18:12
  19:21
teams 31:24
technical 7:7 8:5
tell 35:6,19
telling 52:6
  60:11
tells 24:14
tendency 42:15
testified 4:13
testify 4:12
testimony 73:9
Thank 43:6 46:5
  46:7 71:14
thing 5:6 58:25
things 9:19 15:5
  15:5 32:19
  59:3 69:2
think 7:13 10:3
  11:11,14 14:6
  20:6,10 24:5
  26:16 27:11
  28:11,17,20
  29:5,12 32:7
  33:13 37:21,25
  38:4 42:13
  49:5 51:23
  54:10 59:17
  60:8 63:18,22
  63:25 64:8,12
  64:18,24 66:8
  67:12,25 68:3
  68:6,16,20,21
  68:25 69:13
  71:12

thorough 53:16
thought 18:2
  41:18
three 51:9,13,17
  51:24
time 5:5 9:18
  14:12 41:18
  45:2 46:17
  60:12 64:6
  67:10 71:14
timeframes
  18:12,15
timeline 59:24
times 8:17 48:18
title 5:18 43:3
titled 13:18
today 22:11
  35:17
today's 10:8
Todd 2:10 4:20
  4:22 10:21
  19:20 22:9
  55:4 58:16
told 48:17,18,23
  49:1,4,5,5,7,12
  51:12 54:8
  55:3,10 60:9
  62:15
top 15:14,16
  16:18 32:25
  44:20 55:24
track 13:13
traditional 32:9
train 23:17,24
  27:15 52:14
  53:11,14
trained 30:8
training 12:7
  13:1,2,5,19
  14:8,16,17,20
  14:22 15:8
  16:25 17:15
  18:6 20:7 21:6
  32:12 34:22
  35:2 52:19

53:3,7,16
trains 52:17
transcript 71:18
  73:8
transcription
  73:9
treat 21:8,9
tries 26:10
trigger 39:21,22
troubleshooting
  9:13
true 73:8
trust 48:13
truth 4:13 60:9
  60:12 62:15
truthful 27:9,16
  27:20 30:8
try 5:2 13:2
  36:17 37:25
  42:16 45:3
  50:11 69:13
trying 24:8 25:6
  34:4 60:15
two 6:8 25:21
  37:9
type 6:19 22:10
  31:4,7,19 32:6
  32:22 44:13
types 7:4 8:1
Typically 9:1

          U
U.S 2:2
Uh-huh 46:24
unclear 42:8,14
undersigned
  72:6
understand 5:8
  8:19 21:23
  27:12 36:25
  37:10 42:13
  51:15 66:14
  67:23 71:3
understanding
  26:18

**understands**
  26:17
**understood** 5:10
  63:5
**underwriting**
  8:5
**unfair** 24:9 25:1
  25:19 29:5
**unique** 15:6
**UNITED** 1:1
**unowed** 69:23
**unquote** 32:3
**unreasonably**
  68:25
**unresolved**
  39:21 58:10
**update** 14:11
**updated** 14:7,10
  17:15 18:6,10
  18:21 19:14,23
  19:23 20:5
**updates** 20:3
**updating** 18:17
  19:17
**upset** 66:15,18
  67:22,23 68:1
  68:4,21 70:8
**uses** 15:23

_____
            **V**
_____
**Vague** 58:23
**validate** 40:2
**validates** 40:3
**validation** 39:23
**variable** 44:18
**variables** 44:19
**various** 48:18
**verification**
  40:12,14,18
  41:3,10,15
  42:6,11
**verified** 28:3,5
  36:20,22
**verify** 22:4
  23:12 27:24

  28:8,8
**verifying** 21:21
  23:5
**version** 19:12
**vice** 7:14,15
**Video** 1:14,17
  4:1
**vs** 1:7

_____
            **W**
_____
**wait** 41:7,7
  56:11
**Walter** 55:19
**Walter's** 11:12
**Walters** 1:5
  40:22 41:17,21
  41:23 42:10
  44:3,7 47:13
  47:13 48:16
  50:6,9 51:6,8
  51:19,24 52:6
  52:12 55:12
  56:23 58:1,5
  59:6,19,21
  60:5,11,14,23
  61:8,18 62:7
  62:19,20 63:5
  63:9,19 64:1,5
  64:13,19,25
  65:13,18,22
  66:17,23 67:13
  68:1,7 69:7,9
  69:11,16
**Walters'** 40:25
  41:12 45:11
  50:15 54:4
  55:20 56:12
  57:6,7 58:21
  59:14 61:13
  62:14 68:17
  70:14
**want** 8:12 20:15
  20:15 50:19
  51:16
**wanted** 50:21

  63:9,15
**wasn't** 40:7
  57:11
**way** 9:8 10:2,17
  14:14 39:9
  44:7 51:9,13
  51:17,24 56:10
  63:5,8,9,15
  70:24
**we're** 21:7 39:24
  48:20 49:24
  50:14
**we've** 17:7 22:11
  30:23 48:8
**Wednesday**
  1:18 4:5
**welcome** 71:16
**Why's** 52:1
**witness** 3:2 6:14
  11:4 23:20,24
  24:11,16,22
  25:4,9,15 26:3
  26:6,14,24
  27:5 28:4 29:3
  29:10,16 30:5
  37:21 38:3
  39:7 40:18
  52:23 54:1
  58:24 61:4
  62:10 64:22
  65:4,10,19
  66:1,8,14
  67:10,17 68:11
  68:20 69:19,25
  70:8,18 71:9
  71:16 72:10
  73:10
**word** 28:8 67:18
  67:21
**wording** 66:9
**work** 7:7,10,21
  19:25 24:9,25
  25:6,12,24
  30:16,21 33:21
  34:15 35:4,10

  35:25 36:2,15
  37:7,14 38:13
  38:16,21 39:1
  39:12,20,23
  40:2,3,7,24
  41:14 42:7,12
  42:20 44:8,14
  47:14,17 48:18
  48:19,23 49:1
  49:8,17,20,25
  51:21 52:8
  54:4,8,16 55:3
  55:5,7,10,12
  57:20 58:2
  59:4 61:12,20
  61:23 62:2,16
  62:21 63:1
**worked** 57:1
**working** 39:24
**works** 52:24
**wouldn't** 38:25
  49:18 52:8
**written** 15:20
  17:10 33:23,25

_____
            **X**
_____

_____
            **Y**
_____
**yeah** 8:3,22
  14:18 19:10,18
  24:12 28:4
  29:16 32:13,21
  34:11 35:5
  39:7 46:6
  54:24 55:2
  57:15 58:24
  65:4 68:11
**years** 6:8
**Yep** 10:7 17:12
  19:16 20:1

_____
            **Z**
_____
**Zoom** 1:14,17
  4:1 34:5

_____
            **0**
_____

**075** 45:9

_____
            **1**
_____
**10:00** 1:18 4:4
**12:06** 1:18 71:21
**13th** 72:10 73:16
**17** 1:18 4:5
**17th** 56:8,11,16
  60:2
**19** 3:9
**19th** 44:8

_____
            **2**
_____
**2:19-CV-70-F...**
  1:2
**201** 2:2
**2014** 6:8,9,11
**2017** 6:3,5,8
**2018** 9:15 10:1
  11:16 12:12
  14:5,7,10,15
  15:10,13,16,21
  16:16,20,24
  17:4,11,15
  18:6,10,21,23
  18:23,24 21:20
  21:25 22:19
  33:7,19 34:12
  35:17,18 36:4
  37:6,13 43:7
  44:8,22 45:15
  45:19 46:17,23
  50:6,9,23
  51:10 54:4,8
  54:16 56:18
  58:10,12 63:1
  63:23
**2019** 18:23,24
  19:14,15 55:16
  55:21 56:8,11
  56:16 59:23
  60:1,2
**2020** 1:18 4:5
  72:11 73:16
**2023** 72:23

AVANGARDCHIK vs RAJA MANAGEMENT                    06/29/2020
ERIN FUCHS

Page 85

**23** 72:23
**24** 45:8
**25** 3:9 19:4,6
   20:4 34:2,6

---
**3**
**3** 13:18,23 16:4
**30** 57:16
**314.613.2818**
   2:8
**33408** 2:3
**34** 13:20

---
**4**
**4** 3:4

---
**5**
**5,321.25** 44:9
**5,500** 44:8
**500** 2:6
**561.822.3446**
   2:4
**5th** 59:22 60:1

---
**6**
**63105** 2:7

---
**7**
**7** 45:15 50:23
**721** 2:2
**7701** 2:6
**7th** 44:22 45:19
   46:23 47:21
   50:8 51:6,9
   54:4,8,16

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

IN RE:  Walters, Gary v. FastAC, LLC and FTL Capital Partners, LLC
        Erin Fuchs
        6/17/2020
        133826

Page #  Line #  Change                                                    Reason

UNDER PENALTY OF PERJURY, I DECLARE THAT I HAVE READ MY DEPOSITION
AND THAT IT IS TRUE AND CORRECT SUBJECT TO ANY CHANGES IN FORM OR
SUBSTANCE ENTERED HERE.

_____                    _____
DATE                                                    Erin Fuchs