UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

GARY WALTERS,

        Plaintiff,

v.                                Case No. 2:19-cv-70-JLB-MRM

FAST AC, LLC and FTL CAPITAL
PARTNERS, LLC, d/b/a FTL CAPITAL
FINANCE,

        Defendants.

_____/

# **O R D E R**

The events leading up to this case began when a technician named "Mike" who was employed by Defendant Fast AC, LLC ("Fast AC") told Plaintiff Gary Walters that the ductwork in his air conditioning unit (which Fast AC previously installed) needed to be replaced. Although Mr. Walters was initially hesitant about the cost of the work, Mike assured Mr. Walters that he could secure financing. Mike then accessed a computer and e-signed several documents on Mr. Walters's behalf—none of which Mr. Walters had a chance to read.[1] Due to Mike's actions, Mr. Walters "signed" a credit agreement with FTL Capital Partners LLC ("FTL"), which contained disclosures consistent with an open-end transaction under the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601–1667f.

---

[1] Fast AC is deemed to have admitted all of Mr. Walters's well-pleaded allegations because it is currently in default. (Doc. 118.) The facts recited below are framed with these admissions in mind.

Before Mr. Walters paid any money (and before Fast AC did any work), he decided that he could not afford the ductwork replacement and called Fast AC to cancel the job. But he had no immediate way of cancelling the credit agreement because he had no idea who was financing the repairs. After he received his first bill, Mr. Walters learned that FTL was the creditor and called to inform FTL that the ductwork replacement had been cancelled. Unfortunately, FTL refused to take Mr. Walters at his word because Fast AC's owner incorrectly represented that Fast AC had indeed commenced work. Mr. Walters eventually commenced this action and brought multiple consumer-protection claims against Fast AC and FTL.

The only basis for this Court's subject matter jurisdiction is Mr. Walters's TILA claim against FTL (Count VIII), in which he asserts that his loan from FTL was a closed-end transaction, and therefore FTL's credit agreement (which he never had a chance to review) should have included closed-end disclosures. (Doc. 30 at ¶¶ 135–43.) FTL moves for summary judgment and argues, among other things, that Mr. Walters lacks standing under Spokeo, Inc. v. Robins, 136 S. Ct. 1540 (2016), because he has not suffered an injury-in-fact. (Doc. 104 at 15.)

The Court agrees with FTL to the extent that Mr. Walters lacks an injury-in-fact to support his TILA claim. Accordingly, FTL's motion for summary judgment is **GRANTED** as to Count VIII of the second amended complaint. Count VIII is **DISMISSED** for lack of standing. The remaining claims are **DISMISSED WITHOUT PREJUDICE** for Mr. Walters to refile them in Florida state court.

**BACKGROUND**

I.      **FTL's Business Model and Relationship with Fast AC.**

FTL provides financing products to contractors who install heating and
cooling equipment.  (Doc. 104-3 at 20:12–17.)  More specifically, FTL partners with
contractors who then offer FTL's products to customers wishing to pay for the
contractors' services through financing.  (Id. at 33:8–17.)  To work with FTL, a
contractor must "register" by submitting an online application with their name,
address, distributor references, and any licensing information.  (Id. at 79:16–80:15.)
After FTL receives the application, it issues the contractor a dealer ID and
password that allows the contractor to submit loan applications through FTL's
website.[2]  (Id. at 80:16–19.)  Only an FTL-registered contractor may submit loan
applications to FTL.  (Id. at 100:2–4.)

FTL provides three financing options, but the only one relevant to this case is
the "revolving account."  (Id. at 20:18–22.)  FTL's "revolving account"—also known
as an "ESC card"—is like a credit card in the sense that the customer receives a line
of credit up front.[3]  (Id. at 39:2–6, 115:10–116:7.)  The revolving account's credit

---

[2] Every contractor must also sign a Finance Contractor Agreement.  (Doc. 104-3 at
143:1–6.)  The Finance Contractor Agreement requires an FTL-registered
contractor to, among other things, comply with all applicable laws and install
equipment in accordance with industry standards and best practices.  (Doc. 104-5 at
2.)  It also requires the contractor to indemnify FTL against suits arising out of
warranty breaches or any negligent acts or omissions by the contractor.

[3] Unlike a credit card, however, the revolving account can only be used to purchase
services from that same contractor.  (Doc. 104-3 at 40:17–20.)  For example, if a
customer wanted to purchase additional services or equipment from the contractor
that installed their cooling system, they could call FTL and borrow back up to their
credit limit to cover the cost of additional services.  (Id. at 38:20–39:1.)  That said,

limit is equivalent to the cost of the services that the customer has purchased from the contractor.  (Id. at 38:8–18.)  After approving an application for a revolving account, FTL directly pays the contractor for the full value of the contract and creates a revolving account for the customer with a balance equal to what the customer owes for the services.  (Id. at 38:11–18, 140:4–7.)  The customer then pays down the balance of their revolving account to FTL over time.  (Id. at 38:11–18.)

Of course, FTL must screen customers before approving them for credit, which is where the loan application process comes in.  FTL accepts financing applications by internet, phone, fax, or email.  (Id. at 99:9–17.)  There are two ways in which an FTL-registered contractor can go about completing the loan application. First, the contractor can send the customer a direct hyperlink to FTL's loan application or post the link on their website for customers to access.  (Id. at 100:8– 14.)  The customer then fills out the loan application and submits it to FTL. Second, the contractor can log onto FTL's website, access the loan application, and complete it on the customer's behalf.  (Id. at 100:18–24.)  After a loan application is submitted, FTL will "make a decision whether it is approved or declined within about 15 minutes."  (Id. at 106:7–9.)

If the customer is approved, FTL sends the loan documents and required disclosures to the customer's personal e-mail.  (Id. at 105:21–106:2.)  For security, FTL uses DocuSign software that requires customers to answer three verification

---

FTL does not expect repeat transactions on its revolving accounts and does not advertise their reusable nature.  (Id. at 43:20–44:3.)

questions before they can access the loan documents in their inbox. (Id. at 137:14–138:4.) Once the customer correctly answers the questions, they can review and electronically sign the documents. (Id.)

Fast AC became an FTL-registered contractor on August 16, 2016, after it completed the Finance Contractor Agreement. (Doc. 104-5 at 2–3.) It remained registered with FTL until August 27, 2019, when it was "expelled" for falsely representing to FTL "various times" that it had completed installation work for customers. (Id. at 4; Doc. 104-6 at 48:2–19.) This case arose from one such time.

## II. Mr. Walters's First Experience with Fast AC Leaves Him Feeling Like He Got Swindled.

Mr. Walters is a retired electrician and army veteran in his late sixties who lives in Fort Myers, Florida, with his wife. (Doc. 104-7 at 8:7–24; 19:10–20:18.) He suffers from multiple health problems, including Parkinson's disease and cardiovascular issues. (Id. at 9:18–20.) He cannot ambulate long distances without the aid of a wheelchair. (Id. at 17:23–18:3.)

Sometime in 2017 or 2018, Fast AC contacted Mr. Walters and offered to clean his air conditioner for $35. (Id. at 25:21–24.) A technician from Fast AC named "Mike" came to Mr. Walters's house and inspected the air conditioning unit, which was located in the attic. Minutes later, Mike told Mr. Walters that his air conditioning unit was "really bad," showed Mr. Walters a picture on his cellphone of an air conditioner with "crud" in it (ostensibly Mr. Walters's air conditioner), and told Mr. Walters that he needed a new one. (Id. at 26:12–18.) Mr. Walters agreed.

The very next day, Fast AC took out Mr. Walters's old air conditioning unit and replaced it with a new one.  (Id. at 26:19–24.)  Later, Mr. Walters's son inspected the old air conditioning unit—which Mr. Walters kept for scrap—and did not find any "crud" inside of it.  (Id. at 27:7–8.)  This experience led Mr. Walters to believe that Mike had "swindled" him by showing him a picture of a different air conditioner.  (Id. at 31:22–24; 34:7–13.)  Nevertheless, Mr. Walters decided to "just let it go."  (Id. at 32:16–19.)

## III.    Mr. Walters Agrees to have Fast AC Repair His Ductwork and to Finance the Repairs Through FTL.

In October 2018, Fast AC contacted Mr. Walters to conduct a free cleaning and inspection of the still-new air conditioning unit.  (Id. at 28:21–29:8.)  Mike, the same technician from before, came to Mr. Walters's home on October 19 (a Friday) and went up to the attic without any tools or cleaning supplies.  (Id. at 36:4–13.)  Just like last time, Mike returned with bad news: the new unit's ductwork was "shot," it would not last "another two or three weeks," and Mr. Walters needed to replace the ductwork "real soon."  (Id. at 36:14–19.)

Mr. Walters initially hesitated to accept Mike's offer because he was "broke" and did not have the $5,000 to pay for the repairs.  (Id. at 36:23–25).  But Mike overcame Mr. Walters's uncertainty by representing that he could help him secure financing.  (Id. at 37:1–3.)  What happens next is murky.  Essentially, Mr. Walters claims that Mike got on a computer and "took care" of all the necessary financing paperwork.  (Id. at 37:4–9.)  It is not entirely clear if Mike had his own computer, or if he accessed Mr. Walters's personal computer.  (Id. at 52:15–16; Doc. 104-1 at

13:11–14.)  In any event, Mr. Walters admits that he did not pay close attention to what Mike was doing.  (Doc. 104-7 at 52:20–23.)  The only question Mr. Walters remembers asking Mike about the loan was how much the monthly payment would be, and Mike answered that it would be $50 a month.  (Id. at 51:24–52:11.)  Mr. Walters's interaction with Mike produced several documents, including:

- A work contract between Fast AC and Mr. Walters to replace the ductwork.  (Id., Ex. 1.)  This contract is hand-signed by Mr. Walters, although he does not remember signing it.  (Id. at 46:18–48:6.)

- A credit agreement between Mr. Walters and FTL listing Fast AC as the "dealer."  (Doc. 104-9 at 2–6.)  This agreement is e-signed by Mr. Walters, but he does not remember reviewing or signing it.  (Doc. 104-1 at 28:5–15.)  The credit agreement contains disclosures consistent with an open-end transaction under TILA.

- A document e-signed by Mr. Walters certifying that Fast AC completed the work (which it had not even started) and authoring FTL to pay Fast AC.  (Doc. 104-9 at 7.)  Again, Mr. Walters does not remember e-signing this document.  (Doc. 104-1 at 12:5–10.)

As explained earlier, FTL sends the final loan paperwork to the customer's personal e-mail address and requires them to answer verification questions before they can e-sign the documents.  Mr. Walters contends that he did not e-sign the credit agreement or certification, but he cannot explain how Mike was able to circumvent FTL's DocuSign procedure.  It seems Mr. Walters may have given Mike access to his

e-mail address and provided him with personal information, which allowed Mike to create and answer Mr. Walters's security questions. (Doc. 104-7 at 133:4–134:18; Doc. 104-8.) Regardless of Mike's methods, Mr. Walters does not deny that he agreed—at least orally—to pay for the ductwork replacement through financing.

## IV. Mr. Walters Attempts to Cancel the Credit Agreement Before Any Repairs are Performed, but Fast AC and FTL Refuse.

As mentioned earlier, Mr. Walters agreed to repair the ductwork on October 19, 2018, which was a Friday. The repair was supposed to take place on the following Tuesday. Over the weekend, Mr. Walters discussed the repairs with his wife, who insisted that they could not afford the work. (Doc. 104-7 at 37:22–38:5.)

Heeding his wife's advice, Mr. Walters claims to have called Fast AC on Monday and informed someone that he changed his mind about replacing the ductwork. (Id. at 38:6–9.) There is no recording or transcript of this call, but Mr. Walters claims to have been told that the only way to "cancel the contract" was to "call the finance company," i.e., FTL. (Id. at 38:10–15.) Because he had not reviewed the credit agreement, Mr. Walters did not know the name of the "finance company." (Id.) He asked the Fast AC employee for the "finance company's" contact information, and the employee promised to call him back but never did. (Id. at 38:16.) Over the course of the following month, Mr. Walters claims that he repeatedly called Fast AC about the "finance company's" contact information, all to no avail. (Id. at 38:17–19.)

On November 6, 2018, Mr. Walters received his first monthly bill from FTL, which contained FTL's name and contact information. (Doc. 1-7.) The information

in the bill allowed Mr. Walters to contact the "finance company," and he did so the next day, hoping to cancel the credit agreement. What he got instead was a three-way game of phone-tag between himself, Fast AC, and a customer service representative from FTL named Elora Nolte. Twelve of these calls—eight of which took place on November 7 alone—have been transcribed and provided to the Court.

The calls need not be discussed in detail. Essentially, Mr. Walters called Ms. Nolte on November 7 because he received a bill from FTL and "wanted to know what this is all about." (Doc. 104-1 at 4:4–7.) Ms. Nolte told him that the bill was for Fast AC's ductwork replacement, but Mr. Walters responded that Fast AC had done no work, and he had "cancelled that a long time ago." (Id. at 5:9–14.) FTL then reached out to Matt Foster—Fast AC's owner—who claimed that Mr. Walters stopped Fast AC's technicians in the middle of the job due to a "family emergency" and never rescheduled. (Id. at 38:17–40:16.)

Ms. Nolte called Mr. Walters back and relayed that Fast AC "said that they halfway completed their job and that they were waiting on you to come back and finish it." (Id. at 6:20–24.) To reconcile the conflicting narratives, Mr. Walters asked if Ms. Nolte could set up a conference call with himself and Fast AC. (Id. at 8:1–2.) Ms. Nolte replied that she would have to ask her supervisor for permission and promises to call him back. (Id. at 8:3–5.)

Thirty minutes later, Mr. Walters called Ms. Nolte again, telling her that he unsuccessfully tried to contact Fast AC and reiterating that "no one has done any work." (Id. at 11:3–4.) Ms. Nolte informed Mr. Walters that he signed a document

certifying that the work was already complete.  (<u>Id.</u> at 12:5–8.)  At this point, for the first time, Mr. Walters informed Ms. Nolte that Mike went on his computer, signed all the documents, and answered all the security questions for him.  (<u>Id.</u> at 13:11–14:9.)  After learning this information, Ms. Nolte again said that she would ask her supervisor for permission to organize a three-way call.  (<u>Id.</u> at 14:10–17.)

FTL then called back Mr. Foster and told him of Mr. Walters's accusations. Mr. Foster was completely unphased and responded that "it's going to come down to my technician saying one thing and the customer saying the other," but he was willing to issue a refund if Mr. Walters had decided to completely cancel the job, and he would "get to the bottom of it."  (<u>Id.</u> at 45:13–20, 47:7–10.)

The last call of November 7 is from Ms. Nolte to Mr. Walters.  She informs him that her supervisor did not approve a three-way conference call because FTL was "not really a mediator in this situation," so this is something Mr. Walters "need[s] to work out with the contractor."  (<u>Id.</u> at 15:23–16:4.)  And because Ms. Nolte did not "have any valid proof of anything," she told Mr. Walters that everything with his account would "stay[] the way it is."  (<u>Id.</u> at 16:4–7.)

Another series of calls takes place on November 15 and 16, but these calls go nowhere.  Mr. Walters called FTL claiming that he was able to reach Fast AC, and that he was told "they were going to get things squared away with you."  (<u>Id.</u> at 23:7–10.)  In fact, Fast AC had not contacted FTL at all.  (<u>Id.</u> at 24:10–16.)  FTL again contacted Mr. Foster, who claimed that Fast AC was still negotiating with Mr. Walters about completing the work.  (<u>Id.</u> at 48:23–49:3.)  The exchange

ultimately ends with Mr. Walters resigning himself to litigation because Fast AC was "just giving [him] a runaround."  (Id. at 27:6–19.)

## V.  After Receiving Multiple Past-Due Notices, Mr. Walters Initiates This Case Against Both Fast AC and FTL.

From November 2018 to January 2019, Mr. Walters received several past-due notices and demand letters from FTL.[4]  (Doc. 103-10.)  It is undisputed that none of these notices or letters caused Mr. Walters to make a payment.  On February 5, 2019, Mr. Walters filed his initial complaint in this case.  (Doc. 1.)  The only basis for federal jurisdiction was the sole TILA count against FTL.

Fast AC never answered that complaint or any subsequent complaint. Accordingly, the Court entered a clerk's default against Fast AC, which remains in force.  (Docs. 58, 61.)  But Fast AC did communicate with FTL during this litigation. In April 2019—three months after this case began—an attorney representing Fast AC finally admitted to FTL's counsel that Fast AC never even started Mr. Walters's ductwork replacement job.  (Doc. 104-17.)  Six days later, FTL asked TransUnion[5] to delete the FTL loan from Mr. Walters's credit history.  (Doc. 104-14 at 2.)  That said, FTL admitted to reporting negative payment activity on Mr. Walters's credit report at some point between November 2018 and April 2019.  (Doc. 104-10 at 8.) According to Mr. Walters, the negative impact on his credit score prevented him

---

[4] FTL telephoned Mr. Walters two more times during this period, but these conversations are not illuminating; by that point, Mr. Walters had clearly decided on litigation and refused to speak to the FTL representative.

[5] TransUnion, along with Experian and Equifax, is one of the "big three" credit reporting agencies in the United States.

from: (1) purchasing a Harley Davidson motorcycle, (2) purchasing a Chevy truck, and (3) refinancing his home.[6]  (Doc. 104-7 at 127:4–17, 116:8–14, 118:20–120:2.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In other words, summary judgment is warranted if a jury, viewing all facts and any reasonable inferences therefrom in the light most favorable to plaintiffs, could not reasonably return a verdict in plaintiffs' favor."  Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1581 (11th Cir. 1995) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact . . . ."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Id.

## DISCUSSION

Mr. Walters's sole federal claim is that FTL violated TILA's disclosure requirements.  According to Mr. Walters, FTL's credit agreement contains disclosures consistent with what TILA labels an "open-end" transaction.  In Mr.

---

[6] It is worth noting that there is no evidence of a negative impact on Mr. Walters's credit or his ability to make purchases apart from his own testimony. (Doc. 104-20.) In response to a subpoena, TransUnion was unable to recreate Mr. Walters's credit score during the period which would have reflected FTL's reports of negative payment activity.  (Doc. 104 at ¶ 130; Doc. 108 at ¶ 130.)

Walters's view, the credit agreement is really a "closed-end" transaction, which requires different disclosures under TILA. After carefully reviewing the record, the Court holds that Mr. Walters lacks standing to bring his TILA claim because he has not suffered an injury-in-fact. Because standing is a jurisdictional defect, the Court cannot exercise supplemental jurisdiction over Mr. Walters's remaining state-law claims. To explain the basis for this holding, the Court will proceed in three parts. First, the Court will analyze the current state of standing doctrine for procedural statutory violations in the Eleventh Circuit. Second, the Court will discuss TILA's disclosure requirements and explain why Mr. Walters lacks standing to bring his claim based on the facts of this case. Third, and finally, the Court will explain why it cannot exercise supplemental jurisdiction over the remaining claims.

## I.     The Current State of Standing Doctrine for Procedural Statutory Violations in the Eleventh Circuit.

### A.     Spokeo, Inc. v. Robins

Article III of the Constitution limits the judicial power of the United States to "Cases" and "Controversies." U.S. Const. art. III., §§ 1, 2. One aspect of this limitation is the concept of standing, which evolved from the common law's different treatment of "public rights" and "private rights." See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1550–52 (2016) (Thomas, J., concurring). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). Modern standing doctrine requires a plaintiff to show: (1) an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed

by a favorable judicial decision.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992).  This case starts and ends with the first prong: injury-in-fact.

For purposes of standing, an injury-in-fact must be both "concrete and particularized."  Id.  A concrete injury is one that is "real" and not "abstract"; it must be "de facto" and "actually exist."  Spokeo, Inc., 136 S. Ct. at 1548.  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"  Id. (quoting Lujan, 504 U.S. at 560 n.1).

Importantly, the Supreme Court's decision in Spokeo teaches that a "concrete" injury need not be a "tangible" injury.  Id. at 1549.  An intangible injury may satisfy the injury-in-fact requirement if: (1) it "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts"; or (2) Congress has elevated it to the status of a legally cognizable injury, even though it may have been "previously inadequate in law."  Id.  (citations omitted).

But Spokeo warns that Congress's creation of a statutory right does not automatically result in standing for every plaintiff who invokes the statute.  For instance, "a bare procedural violation [of a statute], divorced from any concrete harm," will not satisfy the injury-in-fact requirement.  Id.  At a minimum, procedural statutory violations must pose "the risk of [a] real harm" that "Congress has identified."  Id. (citing as examples FEC v. Akins, 524 U.S. 11, 20–25 (1998), and Pub. Citizen v. Dep't of Justice, 491 U.S. 440, 449 (1989)).  To illustrate, a consumer reporting agency may commit a "procedural" violation of the Fair Credit

Reporting Act by publishing an inaccurate zip code for a borrower, but "[i]t is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm." Id. at 1550. "[N]ot all inaccuracies cause harm or present any material risk of harm." Id. (emphasis added).

**B.      The Evolution of the Eleventh Circuit's Approach to Procedural Statutory Violations Under Spokeo.**

Federal courts have struggled to incorporate Spokeo into their standing doctrine, and the Eleventh Circuit is no exception.

Two months after Spokeo was decided, the Eleventh Circuit addressed it for the first time in an unpublished decision that Mr. Walters now relies on: Church v. Accretive Health, Inc., 654 F. App'x 990 (11th Cir. 2016). The plaintiff, Mahala Church, sued a putative debt collector under the Fair Debt Collection Practices Act ("FDCPA") because she received a letter advising that she owed a debt to a hospital, and that letter did not include "certain disclosures" required by the FDCPA. Id. at 991. Ms. Church suffered no actual damages from the letter but nonetheless alleged that she "was very angry" and "cried a lot." Id. The district court held that the defendant did not fall within the definition of "debt collector" under the FDCPA and entered summary judgment in favor of the defendant. Id. at 991–92.

The Eleventh Circuit affirmed the district court's decision on the merits, but not before addressing the issue of standing under Spokeo, which had been filed as supplemental authority. Id. at 992. Specifically, the Eleventh Circuit reasoned that Ms. Church alleged an injury-in-fact under the FDCPA because the statute "created a new right—the right to receive the required disclosures in communications

governed by the FDCPA—and a new injury—not receiving such disclosures." Id. at 994. The opinion contains no further analysis about the FDCPA or the facts of the case—no analogies to historically cognizable injuries, no discussion of what "risk" the FDCPA was designed to prevent, and no explanation of which disclosures were missing from the letter. It does, however, analogize Ms. Church's case to one where a test-plaintiff requested information from an apartment complex to investigate racial discrimination. Id. at 993–94 (citing Havens Realty Corp. v. Coleman, 445 U.S. 363, 372–74 (1982)).

Though unpublished, the Church decision was met with criticism from at least two circuit courts, most notably the Seventh Circuit in Casillas v. Madison Avenue Associates, Inc., 926 F.3d 329 (7th Cir. 2019). As explained below, the reasoning of Casillas would eventually be approved by the Eleventh Circuit in a published decision, so the facts of Casillas are worth discussing.

Like Church, the Casillas case involved the FDCPA—the plaintiff, Paula Casillas, received a demand letter from the defendant that failed to adequately describe the statutory mechanism for verifying her debt. 926 F.3d at 332. Ms. Casillas filed a class action against the defendant, and the parties eventually entered a joint motion for class certification and preliminary approval for class settlement. Id. While that motion was pending, the district court sua sponte dismissed Ms. Casillas's complaint for lack of standing. Id. at 332–33.

The Seventh Circuit affirmed. Writing for the majority, then-Judge Amy Coney Barrett explained that Ms. Casillas lacked standing because her injury under

the FDCPA was merely procedural—she did not allege that she tried to (or even considered) verifying her debt.  Id. at 334.  "Any risk of harm was entirely counterfactual: she was not at any risk of losing her statutory rights because there was no prospect that she would have tried to exercise them."  Id.  The majority opinion further distinguished Ms. Casillas's situation from cases where: (1) a party loses a substantive opportunity to respond to negative information[7], (2) a party's request for publicly available information under a sunshine law is denied,[8] and (3) the failure to provide truthful information is ancillary to racial discrimination.[9]

This last distinction is significant because, in a footnote, the Casillas opinion disagrees with Church's reading of Coleman and characterizes Church as an opinion that elevates a "bare procedural violation" to the status of a concrete injury.  Casillas, 926 F.3d at 338 n.7 (citing Church, 654 F. App'x at 994).

Four years after Church, the Eleventh Circuit entered a published opinion that relied heavily on Casillas: Trichell v. Midland Credit Management, Inc., 964 F.3d 990 (11th Cir. 2020) (Katsas, J., sitting by designation).  Yet again, the case involved the FDCPA.  The plaintiffs were two residents of Georgia and Alabama who had not paid their credit card debt for more than six years.  Id. at 995.  Under Georgia and Alabama's statutes of limitations, a debt collector could not sue a debtor more than six years after the debtor's last payment.  Id.  The defendant, a

---

[7] Id. at 334 (citing Robertson v. Allied Sols., 902 F.3d 690, 697 (7th Cir. 2018)).

[8] Id. at 338 (citing Akins, 524 U.S. at 24–25, and Pub. Citizen, 491 U.S. at 449).

[9] Id. at 338 (citing Coleman, 445 U.S. at 373).

debt collector, sent both plaintiffs a letter that offered seemingly generous repayment plans.  Id.  But the letters were proverbial Trojan horses designed to entice the plaintiffs into making a payment and resetting the limitations period.  Id. Each plaintiff sued the debt collector for violating the FDCPA by sending "misleading" communications, and each plaintiff's complaint was dismissed for failure to state a claim.  Id.  The Eleventh Circuit consolidated their appeals and ordered the parties, for the first time, to address standing at oral argument.  Id. Ultimately, the Trichell court held that the plaintiffs lacked standing to bring their FDCPA claims.  Id. at 1005.

As relevant here, the Trichell court reasoned that an intangible statutory injury must be "particularized" and "concrete."  Id. at 1000–01.  In other words, a procedural violation of a statute must not only pose "the risk of real harm," Spokeo, Inc., 136 S. Ct. at 1543, but must also pose a particularized risk to the individual claimant that extends beyond the risk to "consumers in general."  Trichell, 964 F.3d. at 1002.  This standard requires something more than claiming that a statutory violation may pose a risk to a hypothetical, objective consumer.  Id. (citing Frank v. Autovest, LLC, 961 F.3d 1185, 1189 (D.C. Cir. 2020)).  The plaintiffs in Trichell could not state a particularized risk of harm because they themselves were clearly not misled by the letters—neither plaintiff claimed that he had made a payment or even "flirt[ed] with the idea of making a payment."  Id. at 1001.  Without any suggestion that they "were ever at substantial risk of being misled," the plaintiffs

could not establish an injury-in-fact under <u>Spokeo</u>.  <u>Id.</u>  In reaching this conclusion, the <u>Trichell</u> expressly approved of <u>Casillas</u> without citing <u>Church</u>.  <u>Id.</u> at 1001–02.[10]

Another important basis for <u>Trichell</u>'s holding was "dissipated risk."  <u>Id.</u> at 1002.  According to <u>Trichell</u>, any risk of the plaintiffs being misled by the letters must have dissipated before they filed their complaints because "the complaints explain perfectly well why the collection letters were arguably misleading."  <u>Id.</u>  Ergo, neither plaintiff could plausibly allege that he was "at risk of being misled in the future."  <u>Id.</u> at 1003.  As standing must be determined at the time of filing a complaint, the plaintiffs necessarily lacked standing because any risk associated with the letters "never materialized, had dissipated before the complaints were filed, and cannot possibly threaten any future concrete injury."  <u>Id.</u>; <u>see also</u> <u>Nicklaw v. Citimortgage, Inc.</u>, 839 F.3d 998, 1002–03 (11th Cir. 2016) (holding that defendant's failure to comply with New York law by untimely recording a certificate of discharge was not a concrete injury because, in part, the certificate had been recorded two years before the action was filed).

---

[10] <u>Trichell</u> also rejected the position of the Sixth and Second Circuits, which have found standing under the FDCPA "based on the increased . . . risk to consumers in general" —in other words, hypothetical, objective consumers.  <u>Id.</u> at 1002 (citing <u>Macy v. GC Servs. Ltd. P'ship</u>, 897 F.3d 747, 758–59 (6th Cir. 2018), and <u>Cohen v. Rosicki, Rosicki & Assocs., P.C.</u>, 897 F.3d 75 (2d Cir. 2018)).  <u>Trichell</u>'s rejection of the Second Circuit's position is important because, to date, the only circuit-level decision applying <u>Spokeo</u> to TILA is <u>Strubel v. Comenity Bank</u>, 842 F.3d 181, 186 (2d Cir. 2016).  <u>Cohen</u> relied on <u>Strubel</u>'s pronouncement that "[a] consumer who is not given notice of his obligations is likely not to satisfy them and, thereby, unwittingly to lose the very credit rights that the law affords him."  <u>Strubel</u>, 842 F.3d at 190; <u>see also</u> <u>Cohen</u>, 897 F.3d at 82.  Thus, by rejecting the hypothetical consumer standard in <u>Cohen</u>, the Eleventh Circuit has implicitly rejected the reasoning of <u>Strubel</u> as well.

Finally, the en banc Eleventh Circuit recently addressed how much risk is required to satisfy the risk-of-real-harm threshold for statutory injuries. <u>Muransky v. Godiva Chocolatier, Inc.</u>, 979 F.3d 917, 927 (11th Cir. 2020) (en banc). The en banc majority determined that "while very nearly any level of direct injury is sufficient to show a concrete harm, the risk-of-harm analysis entails a more demanding standard—courts are charged with considering the magnitude of the risk." <u>Id.</u> The standard for risk is "high," and federal courts have "a <u>robust judicial role</u> in assessing that risk." <u>Id.</u> (emphasis added). Echoing <u>Spokeo</u>, the <u>Muransky</u> court held that "[t]o avoid 'alleging a bare procedural violation,' the plaintiff must show either some harm caused by the violation or a material risk of harm." <u>Id.</u> at 930 (quoting <u>Spokeo</u>, 136 S. Ct. at 1550).

<u>Muransky</u> offers another important lesson: claims of tangible injury may sometimes be "bound up" with arguments about intangible risk of harm. <u>Id.</u> at 931. For example, the named plaintiff in <u>Muransky</u> claimed that Godiva had exposed him (and his putative class members) to a higher risk of identity theft by printing too many digits of credit card numbers on its receipts—a procedural violation of the Fair and Accurate Credit Transactions Act ("FACTA"). <u>Id.</u> at 922. On appeal, the plaintiff tried to avoid an intangible risk-of-harm analysis by claiming that he suffered a tangible harm; he allegedly wasted time safeguarding himself from identity theft. <u>Id.</u> at 930–31. The Eleventh Circuit explained that the plaintiff's assertions of wasted time necessarily rose or fell "along with this Court's determination of whether the risk posed by Godiva's FACTA violation . . . is itself a

concrete harm." Id. at 931. Because the Court ultimately determined that the underlying FACTA violation did not pose a substantial and impending risk of identity theft, any subsequent time that the plaintiff wasted was a self-inflicted injury that did not provide him with standing. Id.; cf. Tsao v. Captiva MVP Rest. Partners, LLC, 986 F.3d 1332, 1344 (11th Cir. 2021) (reaching a similar result in a non-Spokeo case involving a plaintiff who made two purchases at a restaurant that suffered a data breach—the plaintiff was not at risk of identity theft, and therefore his attempts to mitigate the risk of identity theft were self-inflicted injuries).

## II. Mr. Walters Lacks Standing to Bring His TILA Claim Because He Has Not Suffered an Injury-In-Fact.

Having analyzed the current state of standing doctrine for procedural statutory violations in the Eleventh Circuit, the Court will now explain the basis for Mr. Walters's TILA claim and apply the Eleventh Circuit's precedent on statutory standing. As will be explained, the Court concludes that Mr. Walters has no standing to bring his TILA claim because he has not suffered a concrete and particularized injury—he has not shown that he was at any particularized risk of making an uninformed credit decision.

### A. Open-End and Closed-End Transactions Under TILA.

TILA exists "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). "The informed use of credit results from an awareness of the cost thereof by

consumers." Id. TILA and its implementing regulation, Regulation Z (12 C.F.R. part 1026), recognize two general types of consumer credit transactions: open-end and closed-end. Open-end credit is defined as consumer credit under a plan which:

(i)    The creditor reasonably contemplates repeated transactions;

(ii)    The creditor may impose a finance charge from time to time on an outstanding unpaid balance; and

(iii)    The amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid.

12 C.F.R. § 1026.2(a)(20). The simplest example of open-end credit is a credit card. See, e.g., Grimes v. Fremont Gen. Corp., 785 F. Supp. 2d 269, 286 n.22 (S.D.N.Y. 2011) (citation omitted). Closed-end credit is defined as any type of credit other than open-end credit. 12 C.F.R. § 1026.2(a)(10). A closed-end transaction typically involves a one-time extension of credit and a finance charge that is divided into the term of the loan and incorporated into periodic installment payments (like a car loan or a mortgage). Grimes, 785 F. Supp. 2d at 286 n.22.

TILA and Regulation Z impose different disclosure requirements on open-end and closed-end credit transactions. See Benion v. Bank One, Dayton, N.A., 144 F.3d 1056, 1057 (7th Cir. 1998). A creditor extending an open-end credit plan that is not secured by a home is required to disclose, among other things: (i) each periodic rate used to compute the finance charge, expressed as an annual percentage rate ("APR"), (ii) fees for issuance or availability, (iii) transaction charges, (iv) any grace periods, and (vi) the method used to compute the balance on which the finance charge is based. See generally 15 U.S.C. § 1637(a), 12 C.F.R. § 1026.6(b)(2)(i)–(xv).

TILA imposes qualitatively different requirements on closed-end transactions because their finite nature allows creditors to provide different information up front. For example, a closed-end creditor is required to disclose: (i) the total amount financed, (ii) the total of payments, and (iii) a payment schedule with the number, amount, and timing of the payments required to repay the obligation. See generally 15 U.S.C. § 1638(a); 12 C.F.R. § 1026.18. In theory, these disclosures should be impossible to make for an open-end transaction because they presuppose a finite loan to be repaid over a fixed period through regular installments.

There is, however, one important similarity between the two types of disclosures. Under Regulation Z, most open-end disclosures and all closed-end disclosures must be made in writing. 12 C.F.R. § 1026.5(a)(1)(ii); 12 C.F.R. § 1026.17(a)(1). The written disclosures generally take the form of a so-called "Federal Box"—a place in the contract where all TILA disclosures are grouped together and segregated from the rest of the contract. See, e.g., Clay v. Johnson, 264 F.3d 744, 746 (7th Cir. 2001).

## B. Mr. Walters Has Not Shown That FTL's Alleged Violation of TILA Exposed Him to Any Particularized Risk.

In his second amended complaint, Mr. Walters alleges that while FTL's credit agreement "purports to be open-end," it is actually a closed-end transaction. (Doc. 30 at ¶¶ 137, 140.) According to Mr. Walters, FTL violated TILA because it failed to make the appropriate closed-end disclosures, and this failure "prevented [him] from receiving material information required under TILA." (Id. at ¶ 142.) To be clear, Mr. Walters does not dispute that the credit agreement contains the appropriate

disclosures for an open-end transaction. (Doc. 108 at 14.) And he does not contend

that any of Mike's actions resulted in a TILA violation for which FTL is vicariously

liable.[11] As best the Court can tell, Mr. Walters is arguing only that the credit

agreement should have contained qualitatively different disclosures (that is, closed-

end disclosures) based on the nature of the credit he received.

FTL moves for summary judgment on the TILA claim because Mr. Walters

"lacks any evidence of injury-in-fact." (Doc. 104 at 15.) It argues that Mr. Walters

"himself caused the loan application to be submitted, never stated the loan was not

his, and never paid any money on the loan." (Id.) FTL also denies that Mr.

Walters's credit score was negatively impacted because FTL promptly deleted Mr.

Walters's account as soon as it was "provided with evidence that the work was not

preformed." (Id.) After careful review, the Court agrees that Mr. Walters lacks

standing to bring a TILA claim because he has not demonstrated an injury-in-fact.

Once again, an injury-in-fact must be "concrete and particularized." Spokeo,

Inc., 136 S. Ct. at 1548 (quoting Lujan, 504 U.S. at 560). Depriving someone of

information is, without more, an intangible harm. Id. at 1549 (citing Akins, 524

U.S. at 20–25, and Pub. Citizen, 491 U.S. at 449). Although Congress may elevate

---

[11] Paragraph 136 of the second amended complaint provides, "FTL contracted with
Fast AC who at all times acted as its agent." (Doc. 30 at ¶ 136.) But there is no
contention that Mike's concealment of the loan documents was itself a TILA
violation. All of the vicarious liability theories in the second amended complaint are
under a separate count. Moreover, district courts in the Eleventh Circuit are split
as to whether vicarious liability under TILA is possible. See Bryan v. Fed. Nat'l
Mortg. Ass'n, No. 8:14-cv-307-T-26TGW, 2014 WL 2988097, at *2 (M.D. Fla. July 2,
2014) (collecting cases). Accordingly, the Court will not assume that Mike's actions
in this case constitute the basis for the TILA claim.

an intangible harm to the level of a concrete injury, not every statutory violation produces standing.  Id.  At a minimum, a procedural statutory violation must pose "the risk of [a] real harm" that "Congress has identified."  Id.  The risk-of-harm analysis sets a "high standard," and federal courts have "a robust judicial role in assessing that risk."  Muransky, 979 F.3d at 927.  In addition to being concrete, a statutory injury must be particularized in the sense that it "must affect the plaintiff in a personal and individual way."  Spokeo, Inc., 136 S. Ct. at 1548 (quoting Lujan, 504 U.S. at 560 n.1).  This means that a procedural statutory violation must pose some particularized risk beyond risk to "consumers in general," or a hypothetical, objective consumer.  Trichell, 964 F.3d. at 1002 (citing Frank, 961 F.3d at 1189).

TILA guards against the risk of "uninformed use of credit," and this risk is properly mitigated when consumers have "an awareness of the cost [of credit]" due to proper TILA disclosures.  15 U.S.C. § 1601(a).  Mr. Walters claims that he suffered an injury-in-fact because the credit agreement erroneously contained open-end disclosures when, in fact, FTL was providing him with closed-end credit and should have given him closed-end disclosures.  This mistake, according to Mr. Walters, "prevented an informed financial decision."  (Doc. 108 at 14.)  The Court fails to see how this is possible.

The essence of Mr. Walters's TILA claim is that he was at risk of making an uninformed credit decision because the Federal Box in the credit agreement should have had closed-end disclosures instead of open-end disclosures.  The fatal flaw in Mr. Walters's reasoning is that he never had an opportunity to review the credit

agreement in the first place.  In fact, he never had an opportunity to review any of

FTL's loan documents before agreeing to finance the ductwork repair because Mike

never showed them to him.  It is, therefore, impossible for the Court to conclude

that Mr. Walters was at any particularized risk of making an uninformed credit

decision due to FTL's failure to include closed-end disclosures in the credit

agreement's Federal Box.  The risk of a person making an "uninformed" credit

decision because a document that they never had a chance to review may have had

qualitatively wrong disclosures is nil.  Cf. Truckenbrodt v. CBE Grp., Inc., No. 2:19-

cv-2870 (ERK) (SMG), 2020 WL 6161254, at *2 (E.D.N.Y. Oct. 21, 2020) (finding no

injury-in-fact under the FDCPA where plaintiff claimed that a letter he never saw

was misleading).  Stated differently, Mr. Walters was not at any particularized risk

of his credit behavior being influenced by the credit agreement having open-end

instead of closed-end disclosures if the agreement was invisible to him in the first

place.  Such a risk would be "entirely counterfactual."  Casillas, 926 F.3d at 334.

In a sense, this case is similar to Trichell, where the Eleventh Circuit held

that the plaintiffs failed to state a particularized FDCPA injury because: (1) their

pleadings did not allege that they themselves were ever at risk of being misled by

the defendant's communications, and (2) the risk of their being misled completely

dissipated after they filed their complaints.  964 F.3d at 1002.  Although the present

case has advanced beyond the pleading stage, Mr. Walters has likewise failed to

show that he was at any risk of having his credit behavior impacted by receiving

open-end disclosures instead of closed-end disclosures in the credit agreement.  Just

as the risk to the plaintiffs in <u>Trichell</u> "never materialized," the risk of incorrect disclosures in the credit agreement influencing Mr. Walters's choices also "never materialized" because he never had an opportunity to review the agreement or any other loan document that might have contained the Federal Box. <u>Trichell</u>, 964 F.3d at 1003; <u>see also</u> 12 C.F.R. § 1026.17(a)(1) (mandating that closed-end disclosures be made "<u>in writing</u>" (emphasis added)). Although putting qualitatively incorrect disclosures in the Federal Box may hypothetically pose a risk to an objective consumer, Mr. Walters has not shown that he was at any particularized risk of making an uninformed credit decision under the idiosyncratic facts of this case.

In opposing summary judgment, Mr. Walters relies almost exclusively on the Eleventh Circuit's unpublished decision in <u>Church</u>. (Doc. 108 at 13–14.) "Like in <u>Church</u>," Mr. Walters claims that "FTL deprived [him] from receiving critical information resulting in concrete injury." (<u>Id.</u> at 14.) "By preventing [him] from receiving closed-end credit disclosures, FTL hid the true cost of the financing from him and prevented an informed financial decision." (<u>Id.</u>)

Mr. Walters's reliance on <u>Church</u> is misplaced. As previously detailed, <u>Church</u> was an unpublished decision holding that the plaintiff suffered an injury-in-fact because a putative debt collector failed to include "certain disclosures" required by the FDPCA in a letter. <u>Church</u> does not contain any analysis of the "risk" that the FDCPA is designed to prevent, let alone whether that risk affected the plaintiff "in a personal and individual way." <u>Spokeo, Inc.</u>, 136 S. Ct. at 1548 (quoting <u>Lujan</u>, 504 U.S. at 560 n.1). In <u>Trichell</u>, a published opinion which is binding on this

Court, the Eleventh Circuit clarified that an injury-in-fact must be something more than a risk to a hypothetical, objective consumer. 964 F.3d at 1002 (citing Frank v. Autovest, LLC, 961 F.3d 1185, 1189 (D.C. Cir. 2020)). The Trichell court further held that risk which never materializes cannot form the basis for a concrete injury. Id. at 1003. Thus, the Court rejects Mr. Walters's position that not receiving closed-end disclosures inevitably creates an injury-in-fact under Church.

As a postscript, Mr. Walters claims he also "suffered economic harm" in the form of "[w]asted time and money," which are "actual damages." (Doc. 108 at 14.) Presumably, Mr. Walters means to argue that he suffered a tangible harm, which would obviate the need for a risk-of-harm analysis under Spokeo. See Tsao, 986 F.3d at 1338 ("Tangible injuries can include both straightforward economic injuries, and more nebulous injuries, like lost time . . . . " (internal citations omitted)). Under the facts of this case, the Court finds Mr. Walters's argument unconvincing.

By his own admission, Mr. Walters never paid any money to FTL. As such, there is no reason for the Court to credit his conclusory argument that he "wasted money." As for wasted time, Mr. Walters is ostensibly referring to the time he spent calling FTL and trying to get the credit agreement cancelled. The Eleventh Circuit has held that loss of time can sometimes be a concrete injury. See, e.g., Pedro v. Equifax, Inc., 868 F.3d 1275, 1280 (11th Cir. 2017) (holding, in a case involving a violation of the Fair Credit Reporting Act, that time wasted in resolving a credit inaccuracy was a concrete injury). A lowered credit score, which Mr. Walters does not specifically cite in response to FTL's standing argument, could also be a

concrete economic injury.  See Daniel v. Concord Advice, LLC, No. 8:19-cv-02978-T-02SPF, 2020 WL 2198204, at *2 (M.D. Fla. May 6, 2020).

In this case, however, all of Mr. Walters's alleged tangible harms presuppose an intangible harm which this Court has already ruled out.  Mr. Walters never had a chance to review the credit agreement, and therefore could not have suffered a particularized injury by the sheer existence of incorrect TILA disclosures (open-end, rather than closed-end) in that agreement.  A few days after Mike's visit, Mr. Walters unilaterally decided—without ever seeing the credit agreement—that he made a poor credit decision which needed to be undone.  Mr. Walters's belief led him to try and cancel the ductwork replacement job and the financing for it.  His efforts (and Defendants' less-than-sympathetic response) allegedly resulted in "wasted time" and some kind of impact on his credit score.[12]

Yet treating these injuries as concrete and particularized only makes sense if the Court accepts Mr. Walters's belief that he made a poor credit decision because he was deprived of information due to FTL's alleged TILA violation—a risk the Court has already rejected as not sufficiently particularized.  Under Muransky, a plaintiff cannot suffer a concrete harm through his own attempts to mitigate a nonexistent risk of injury (e.g., spending time and money to mitigate the risk of identity theft when no such risk exists).  Muransky, 979 F.3d at 931.  The Court sees no reason why the logic of Muransky would not also apply to the non-particularized risk of injury in this case.  In other words, like the plaintiffs in

---

[12] But see supra note 6.

29

Muransky, Mr. Walters's assertions of injury "necessarily rise[] or fall[] along with this Court's determination of whether the risk posed by [FTL's] [TILA] violation, as pleaded by [Mr. Walters], is itself a [particularized] harm." Muransky, 979 F.3d 931. The Court has determined that Mr. Walters has not shown any particularized risk of making an uninformed credit decision based on FTL's failure to provide him with closed-end disclosures in a document that was invisible to him in the first place. Therefore, it makes no sense to hold that Mr. Walters' self-induced efforts to cancel the credit agreement because he independently concluded it was too expensive—and everything that followed—created an injury-in-fact under TILA.[13]

As a word of caution, the Court is not creating a "detrimental reliance" element for all TILA claims. Although TILA does require determinantal reliance for actual damages, no such showing is necessary for statutory damages. Turner v. Beneficial Corp., 242 F.3d 1023, 1028 (11th Cir. 2001); Brown v. SCI Funeral Servs. of Fla., Inc., 212 F.R.D. 602, 606 (S.D. Fla. 2003). In that sense, TILA is essentially a strict liability statute. See Shroder v. Suburban Coastal Corp., 729 F.2d 1371, 1380 (11th Cir. 1984) ("Liability will flow from even minute deviations from requirements of the statute and Regulation Z." (citation omitted)). But the Court is not free to ignore the Supreme Court's Spokeo decision or the Eleventh Circuit's interpretation of it. Procedural violations of TILA must pose "the risk of [a] real

---

[13] Self-induced harms could also be analyzed under the traceability prong of standing, depending on the case. Compare Muransky, 979 F.3d at 931, with Schalamar Creek Mobile Homeowner's Ass'n v. Adler, No. 20-13415, 2021 WL 1827934, at *4 (11th Cir. May 7, 2021) (per curiam).

harm" that "Congress has identified." <u>Spokeo, Inc.</u>, 136 S. Ct. at 1549. Under the facts of this case, Mr. Walters has not demonstrated a <u>particularized</u> risk of the harm that Congress has identified in TILA. That is not to say that other plaintiffs who bring similar claims based on credit transactions being mislabeled will likewise fail. Binding precedent nevertheless compels this result in Mr. Walters's case.

## III. The Court Has No Discretion to Exercise Supplemental Jurisdiction Over Mr. Walters's State-Law Claims.

Because the TILA claim has been dismissed for lack of standing, which touches on subject-matter jurisdiction, the Court has no discretion to exercise supplemental jurisdiction over the remaining state-law claims. <u>See</u> <u>Garcia v. Miami Beach Police Dep't</u>, 336 F. App'x 858, 860 (11th Cir. 2009) ("Because Garcia lacks standing to bring the § 1983 failure to prosecute claim, however, supplemental jurisdiction is unavailable." (citing <u>Scarfo v. Ginsberg</u>, 175 F.3d 957, 962 (11th Cir.1999))). Accordingly, Mr. Walters's remaining state-law claims are dismissed without prejudice to be filed in a Florida state court, should he choose to do so.

<span style="font-variant: small-caps;">Conclusion</span>

For the reasons above, it is **ORDERED:**

1. FTL's motion for summary judgment (Doc. 104) is **GRANTED** as to Count VIII of the second amended complaint (Doc. 30).

2. Count VIII is **DISMISSED** for lack of standing.

3. The Court **DISMISSES** Counts I–VII for lack of subject-matter jurisdiction **WITHOUT PREJUDICE** to refile in state court.

4.    The Clerk is **DIRECTED** to terminate all pending motions and

deadlines, enter judgment in favor of Defendants in conformance with

this Order, and close this case.

**ORDERED** in Fort Myers, Florida, on May 13, 2021.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE